MELODY BEGGS, Plaintiff-Appellee, v. JAMES GRIFFITH, Defendant-Appellant.

Fifth District   No. 5—08—0083

Opinion filed August 25, 2009.

WELCH, J., dissenting.

Shane M. Carnine, of Campbell, Black, Carnine, Hedin, Ballard & McDonald, P.C., of Mt. Vernon, for appellant.

Daniel R. Price and James B. Wham, both of Wham & Wham, of Centralia, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

Defendant James Griffith appeals from the trial court's entry of a judgment on a jury's verdict finding in favor of plaintiff Melody Beggs for injuries and damages she sustained in an accident involving horses pastured on Griffith's property. He also appeals from the trial court's January 18, 2008, denial of his posttrial motion and the January 22, 2008, denial of his motion for a setoff. We affirm.

## FACTS

Griffith had his house and acreage listed for sale. Until 2000, Griffith raised horses on his property. Due to declining health, he sold his horses. In the fall of 2005, as a favor to a friend and neighbor, Gailen Rankin, Griffith allowed Rankin to temporarily pasture on his property eight or nine horses that Rankin owned. This was not a contractual relationship and apparently no money exchanged hands. Before the horses were brought to Griffith's property, Rankin installed a battery-operated electric fence to contain them. Rankin paid for and maintained the fence. Rankin provided his horses with all the grain, exercise, grooming, training, and medical attention. Griffith had no active involvement with the horses. The horses also had open access to Griffith's barn for shelter.

Plaintiff Melody Beggs and her husband were in the market for property that would accommodate their animals, which included horses, donkeys, and goats. Melody contacted a realtor, who scheduled an October 11, 2005, showing of Griffith's home and property. At the showing were Melody, her husband, Dennis Beggs, Melody's brother and sister-in-law, Scott and Judy Beckmann, and the real estate agent, Lori Baldridge.

Both Griffith and Rankin were present but did not take part in the tour of the property. After viewing the house, Melody and the others began looking over the grounds. The horses were in a pasture separated from the house area by way of a fence. When Lori Baldridge went to ask Griffith a question, they saw the horses in the pasture next to the barn and witnessed one horse walking up toward the barn. Griffith indicated to Lori that the horse must be coming up for a treat. Melody opened up the gate and entered the pasture. Upon entering the pasture, Melody also noticed the presence of the horses. She and the others continued walking through the pasture toward the barn in order to "see what condition the barn was in." Three horses followed them into the barn through an open door on the east side of the barn. The horses then walked up behind Melody and the others and passed them by. Immediately after passing Melody and her companions, the horses turned and suddenly ran side-by-side straight back toward the barn door opening. Melody testified that she was in the middle of the group and tried to turn and get out of the horses' way when she realized what the horses were doing. She was struck on her left side by one of the horses and fell on her right hand. She claimed that the sequence of events had happened too quickly to have avoided contact with the horse. Her husband testified that Melody was struck by the side of the horse, knocking her to the ground and actually pushing her across the barn floor. She sustained a fairly substantial wrist fracture.

Melody's theory in this case is that at the time of the injury, she was on Griffith's property at his invitation as a potential purchaser and that the barn inspection was a part of the real estate showing. Additionally, Melody contends that Griffith knew that the horses had open access to the barn for shelter. Melody argues that, knowing all this, Griffith did nothing to prevent the horses from coming into contact with the plaintiff when he clearly had the ability to do so. Under these circumstances, Melody contended that Griffith maintained some control over the horses akin to an owner within the purview of the Animal Control Act (the Act) (510 ILCS 5/1 *et seq.* (West 2004)).

Initially, Melody only sued Griffith, but upon learning that the horses were owned by Rankin, not Griffith, she amended her complaint to name him as a second defendant. Before the trial, she

dismissed her claim against Rankin and further dismissed her negligence claim against Griffith. The case proceeded to a trial in November 2007 against Griffith solely on an Animal Control Act claim. At the conclusion of the trial, the jury returned a verdict in favor of Melody in the amount of $27,276.73. Griffith filed a posttrial motion seeking a new trial and also seeking a setoff. The trial court denied the motion for a new trial on January 18, 2008, and denied the request for a setoff on January 22, 2008. Griffith appeals.

## ISSUES AND ANALYSIS

### Animal Control Act

■ On appeal, Griffith contends that Melody did not present a *prima facie* case pursuant to the Animal Control Act because the plaintiff did not prove that Griffith was an "owner" of the horses and the plaintiff did not prove that the horses acted "without provocation" within the meaning of the Act. Griffith also contends that Melody is not within the class of people protected under the Act or, alternatively, that she assumed the risk of injury. We turn to the applicable sections of the Animal Control Act. At the time of the incident, section 16 stated as follows:

> "If a dog or other animal, without provocation, attacks or injures any person who is peaceably conducting himself in any place where he may lawfully be, the owner of such dog or other animal is liable in damages to such person for the full amount of the injury sustained." 510 ILCS 5/16 (West 2004).

### Owner

■ In order for Griffith to be liable pursuant to the Animal Control Act, he must necessarily be deemed an "owner" of the horses. The term "owner" is further defined in the Act as "any person having a right of property in an animal, or who keeps or harbors an animal, or who has it in his care, or acts as its custodian." 510 ILCS 5/2.16 (West 2004). The definition is broader than actual ownership of the animal but requires a position of some control like that an owner would maintain. *Frost v. Robave, Inc.*, 296 Ill. App. 3d 528, 533, 694 N.E.2d 581, 584 (1998).

In determining the "control" required for the liability of a keeper or harborer of an animal, the focal point is the precise moment of the accident at issue—not whether or not the keeper or harborer maintained control at some other time. *Frost*, 296 Ill. App. 3d at 535, 694 N.E.2d at 585-86.

At common law, a person injured by an animal could not recover unless the injured party could prove that the animal had dangerous

propensities, in that the animal had attacked someone before. *Steinberg v. Petta*, 114 Ill. 2d 496, 500, 501 N.E.2d 1263, 1265 (1986). One of the reasons that the Animal Control Act became law was to eliminate the requirement that an injured party must plead and prove that the animal owner knew or should have known about the animal's dangerous propensities. *Robinson v. Meadows*, 203 Ill. App. 3d 706, 709, 561 N.E.2d 111, 113 (1990), citing *Forsyth v. Dugger*, 169 Ill. App. 3d 362, 365, 523 N.E.2d 704, 706 (1988). As the above-quoted statutory section sets forth, in order to recover with an Animal Control Act claim, the plaintiff must prove four elements: "(1) an injury caused by an animal owned by the defendant; (2) lack of provocation; (3) the peaceable conduct of the injured person; and (4) the presence of the injured person in a place where he has a legal right to be." *Meyer v. Naperville Manner, Inc.*, 262 Ill. App. 3d 141, 147, 634 N.E.2d 411, 415 (1994). While the Animal Control Act is not negligence-based and does not require an injured party to prove that the "owner" is negligent, the Act also does not impose strict liability upon the owner. *Smith v. Lane*, 358 Ill. App. 3d 1126, 1135, 832 N.E.2d 947, 955 (2005).

To the extent that a review of this jury's verdict necessitates a review of this Act, our review would be *de novo. Central Illinois Light Co. v. Department of Revenue*, 335 Ill. App. 3d 412, 415, 780 N.E.2d 1109, 1111 (2002). But the finding of the jury relative to whether or not Griffith satisfies the definition of "ownership" as one who "keeps or harbors" remains a question of fact, and thus, that determination will not be reversed unless it is contrary to the manifest weight of the evidence. *Thompson v. Dawson*, 136 Ill. App. 3d 695, 699-700, 483 N.E.2d 1072, 1075 (1985).

The purpose of the Animal Control Act "is to encourage tight control of animals in order to protect the public from harm." *Wilcoxen v. Paige*, 174 Ill. App. 3d 541, 543, 528 N.E.2d 1104, 1106 (1988); *Meyer v. Naperville Manner, Inc.*, 262 Ill. App. 3d 141, 148, 634 N.E.2d 411, 415 (1994). Because liability is mandated under the Act, the existence of the law serves as an incentive to keep one's animals from harming others. *Wilcoxen*, 174 Ill. App. 3d at 543, 528 N.E.2d at 1106. Since the overriding purpose of the Act is the protection of the public from harm, the Act imposes penalties against both the owner of the animal and anyone "who places himself in a position of control akin to an owner." *Wilcoxen*, 174 Ill. App. 3d at 543, 528 N.E.2d at 1106. But there must be "a factual and reasonable basis to impose liability." *Meyer*, 262 Ill. App. 3d at 148, 634 N.E.2d at 415.

To determine if liability is appropriate, courts must carefully consider the specific facts of the case. *Smith*, 358 Ill. App. 3d at 1135, 832 N.E.2d at 955; *Thompson v. Dawson*, 136 Ill. App. 3d 695, 699, 483 N.E.2d 1072, 1075 (1985).

■ With these principles in mind, we now turn to the specific facts of our case. Melody's presence on the property was at the invitation of Griffith and to his potential benefit in the sale of his property. Her sole purpose for being there was to determine if she and her husband wanted to purchase Griffith's property. A thorough inspection of the entire property, including the barn, was reasonable and should have been expected by Griffith. Griffith was present at the time of the property showing and apparently answered questions presented by the real estate agent, Lori Baldridge. Rankin was present as well. Rankin testified at the trial that he would not have put the horses anywhere that Griffith did not want them. He further stated that if Griffith had asked, he would have kept the horses from having access to the barn during the property showing.

Griffith, in support of his argument that he did not maintain the requisite control to be considered an owner under the Animal Control Act, cites to a number of cases where the courts held that liability did not extend to property owners who were alleged to be harborers or keepers of injurious animals. Central to these cases is the degree of or ability to control the injurious animals. We review some of these cases.

Notably, the court in *Heyen v. Willis*, 94 Ill. App. 2d 290, 291-92, 236 N.E.2d 580, 581 (1968), found that a landowner who leased his pasture to a cattle owner could not be held responsible as an "owner" of the cattle when a driver had an accident attempting to avoid hitting the cattle that had escaped onto the roadway. The court stated that the Act "requires more than the passive ownership of grazing lands." *Heyen*, 94 Ill. App. 2d at 295, 236 N.E.2d at 583. Similarly, in *Frost v. Robave, Inc.*, 296 Ill. App. 3d 528, 530, 694 N.E.2d 581, 582 (1998), the court found that a business was not liable for a dog attack occurring off the business property despite the fact that the business owner-employee brought the dog to work from time to time and, while at work, the dog was provided with food and water. Focusing on the precise time of the injury, the court concluded that any responsibility that the business might have had as the dog's keeper ended once the dog left the premises (the attack occurred at the owner's apartment). *Frost*, 296 Ill. App. 3d at 535-38, 694 N.E.2d at 586-87. Finally, in *Steinberg v. Petta*, 114 Ill. 2d 496, 498, 501 N.E.2d 1263, 1264 (1986), an absentee landlord was sued successfully under the Act for injuries to a young boy caused by a tenant's dog (the dog lunged over its fence into an alley, biting the boy on the nose). In reversing, the supreme court found that the Animal Control Act contemplated that a harborer or keeper of animals have some degree of care, custody, or control and that the absentee landlord had none. *Steinberg*, 114 Ill. 2d at 502, 501 N.E.2d at 1266. In all three of these cases, the defendants were not

present when the animal-related injuries occurred, nor did the injuries even occur on the defendants' property. In two of the cases, *Heyen v. Willis* and *Steinberg v. Petta*, the actual owners of the animals were also tenants in legal possession of the property where the animals had been kept. We believe those factors to be important to the courts' analysis of the degree of control available to the defendants. In contrast, here, Griffith was not only present and in legal possession of the property, but he also maintained the ability to control the animals at the precise time of the animal-related injuries but chose not to exercise that control. Moreover, by soliciting Melody as a potential buyer of his property, Griffith was instrumental in placing her in proximity with the very animals that harmed her.

Keeping in mind that the overriding purpose of the Animal Control Act is to protect the public from harm, we believe that the control available to Griffith at the time of the accident, coupled with the reason for Melody's presence on his property, is the type of fact-specific scenario warranting liability under the Act. Griffith clearly maintained the ability to keep the horses away from the prospective buyers but chose not to do so. Looking at the precise time of the accident relative to control (*Frost*, 296 Ill. App. 3d at 535, 694 N.E.2d at 585-86), we conclude that Griffith qualified as an "owner" under the Act.

## Lack of Provocation

Griffith further contends that Melody should not have recovered because she did not establish that she had not provoked the horses' "attack." We think that the evidence established a lack of provocation.

Griffith correctly states that the plaintiff seeking recovery under the Animal Control Act bears the burden of proof on the issue of a lack of provocation. 510 ILCS 5/16 (West 2004); *Guthrie v. Zielinski*, 185 Ill. App. 3d 266, 269, 541 N.E.2d 178, 180 (1989). As a matter of law, if the animal was provoked, there can be no recovery, even if another person or outside stimulus causes the behavior that results in an injury to the plaintiff. *Forsyth*, 169 Ill. App. 3d at 366, 523 N.E.2d at 706; *Meyer*, 262 Ill. App. 3d at 149, 634 N.E.2d at 416.

Griffith then argues that it is unquestionable that these horses must have reacted to some stimulus in order to have bolted as they did. He bases this theory on generic testimony of Melody and her husband Dennis that horses can be easily startled or "spooked." His reasoning is that because he believes that "something" must have spooked the horses, Melody could not establish a lack of provocation. If reasonable people differ on the facts supporting the provocation issue, then the issue is certainly one to be determined by the jury. See *Guthrie*, 185 Ill. App. 3d at 270, 541 N.E.2d at 180-81.

The undisputed testimony during the trial did not support Griffith's argument that the horses "must have been provoked." While the parties agree that horses can spook easily, there was no testimony by anyone who was in the barn at the time that any provocation had occurred. The jury certainly cannot be allowed to speculate on provocation where no such evidence exists. The testimony was absolute on this issue. While all the persons in the barn were aware of things that could spook horses, no one testified that any such provocation precipitated the horses' rapid departure from the barn. Melody testified that she observed no external stimulus, heard no sounds, and saw no movement. Judy Beckmann, Melody's sister-in-law, testified also to the fast sequence of events in the barn, and she specifically testified that she neither saw nor heard anything that could have startled the horses. Melody's husband, Dennis, testified that he saw nothing and heard nothing that could have caused the horses to bolt. No one else witnessed what happened.

We conclude that the testimony heard at the trial was sufficient to establish a lack of provocation as a matter of law.

### Class of Persons Protected by Animal Control Act and Assumption of Risk

Griffith next contends that Melody was not within the class of persons that the Animal Control Act was designed to protect or, alternatively, that she assumed the risk. In order to seek damages pursuant to the Animal Control Act, the injured party must be within the protected class covered by the Act. *Magnotti v. Hughes*, 57 Ill. App. 3d 1000, 1004, 373 N.E.2d 801, 804 (1978). The legislative intent was to protect people that "may not have any way of knowing or avoiding the risk that the animal poses to them." *Harris v. Walker*, 119 Ill. 2d 542, 547, 519 N.E.2d 917, 919 (1988).

The cases cited by Griffith are inapposite. See *Harris*, 119 Ill. 2d 542, 519 N.E.2d 917 (finding that the agreement to rent the horse from the defendant's stable established that the plaintiff fully understood and accepted the risks of horseback riding and therefore removed himself from the class of protected persons); *Vanderlei v. Heideman*, 83 Ill. App. 3d 158, 403 N.E.2d 756 (1980) (a professional horseshoer who had voluntarily entered into a contract to work on the horses' hoofs was exempt from the Act due to the horseshoer's voluntary subjection to the risks); *Meyer v. Naperville Manner, Inc.*, 262 Ill. App. 3d 141, 634 N.E.2d 411 (1994) (holding that the Act does not extend to a rider of a horse enrolled in riding school, because once the rider has mounted the horse, the rider is no longer a bystander or observer but is in active participation with the animal in the recreational activity of riding).

At the time of the accident, Melody was clearly an innocent bystander. Unlike the cases Griffith urges, Melody was not employed in an occupation pertaining to the horses, she was not riding a horse, and she did not have a contractual relationship involving the use of these horses. In fact, she sought no interaction with the horses of any kind. Likewise, just because Melody had prior experience with horses does not, without more, translate into an assumption of the risk. Melody was merely inspecting Griffith's barn at the same time the horses were permitted by Griffith to freely come into contact with her. We believe that Melody was in the protected class that the Act seeks to protect and that she did not assume a risk.

For all the above reasons, we find that the application of the Animal Control Act was both reasonable and appropriate.

### Setoff for Medical Payments

■ Griffith contended at the trial, and now again on appeal, that he is entitled to a $2,000 setoff against any judgment. The $2,000 is associated with a medical-payments provision contained within his own farm-protection insurance policy. He contends that the compensatory goal of damages is not supposed to punish the defendant or create a windfall to the injured party. *Heldenbrand v. Roadmaster Corp.*, 277 Ill. App. 3d 664, 671, 660 N.E.2d 1354, 1360 (1996). The trial court in its order disallowing the setoff correctly stated that there are some situations where a double recovery is allowed, and it cited *Halverson v. Stamm*, 329 Ill. App. 3d 1206, 769 N.E.2d 1076 (2002), as an example, which allowed a double recovery because the insured had paid for and expected both coverages under the particular policy.

While Griffith correctly speaks about the generalities of double recoveries being not favored, he ignores the very policy language utilized by his insurer relative to subrogation rights:

"If we pay for a loss, we may require that the insured assign to us the right of recovery up to the amount we pay. ***

Subrogation does not apply to Coverage M—Medical Payments to Others ***."

Instead, he points us to the policy language that indicates, "If more than one coverage applies to a loss, we pay no more than the actual loss." But, as the trial court accurately points out, Melody Beggs is not the defendant's insured and therefore is not subject to that policy language that appears to limit coverages. Additionally, by its own language, Griffith's insurer contractually disallows itself from subrogating medical-payments claims.

On appeal, Griffith makes no attempt to explain the no-subrogation-of-medical-payments clause. He continues to simply argue that a double recovery should be disallowed, essentially making a fairness argument.

To the extent that the $2,000 amounted to a double recovery, we find that there is nothing in the insurance policy, in public policy, or in the law that would prevent the award in this particular case.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Marion County is hereby affirmed.

Affirmed.

STEWART, J., concurs.

JUSTICE WELCH, dissenting:

I respectfully dissent. Under the Animal Control Act (the Act) (510 ILCS 5/1 *et seq.* (West 2004)), the defendant, James Griffith, cannot be construed as an "owner" of the horses. Although the primary goal of the Act is to encourage tight control of animals for the public's protection, there must be a factual and reasonable basis to impose liability upon the defendant. *Goennenwein v. Rasof*, 296 Ill. App. 3d 650, 653 (1998). In order to be held liable under the Act, the injury must be caused by an animal owned by the defendant, and the term "owner" has consistently been construed to involve some measure of care, custody, or control at the time of the injury. *Goennenwein*, 296 Ill. App. 3d at 654. The Act imposes this liability not only on the animal's legal owner but also against anyone who places himself in a position of control akin to an owner. *Frost v. Robave, Inc.*, 296 Ill. App. 3d 528, 533 (1998).

Along with defining legal "owner," the statute sets forth that those who keep or harbor the animal may also be held liable under the Act as "owners." 510 ILCS 5/2.16 (West 2004). The words "keeps" and "harbors" in the statute both necessarily imply an intent to exercise control over an animal. *Thompson v. Dawson*, 136 Ill. App. 3d 695, 698 (1985). Therefore, merely allowing an animal to temporarily be on one's land does not make the landowner a keeper or harborer of the animal under the Act. *Goennenwein*, 296 Ill. App. 3d at 654. The defendant must exercise some higher degree of care, custody, or control over the animal to be considered an "owner" for liability purposes. *Goennenwein*, 296 Ill. App. 3d at 654. Further, to qualify as an "owner" under the Act, more is required than passive ownership of grazing land. *Heyen v. Willis*, 94 Ill. App. 2d 290, 291-92 (1968). Finally, where the legal owner of the animal is present and in control of it at the time the injury occurs, the landowner cannot be considered an "owner" under the Act merely because the landowner permitted the animal to be on the premises. *Goennenwein*, 296 Ill. App. 3d at 654.

In this case, Griffith was not in a position of control akin to the horses' legal owner, Gailen Rankin. Although Griffith owned the land and barn and allowed Rankin to temporarily keep his horses there, Griffith had no active involvement in the horses' care. Griffith did not feed, groom, train, exercise, or care for the horses. Rankin provided all the necessary care for the horses, including constructing and maintaining a fence to contain the horses on the land. Further, Rankin was also present on the land at the time the injury took place. Therefore, since Griffith cannot be considered an "owner" under the Act, the jury's verdict for the plaintiff in this case was against the manifest weight of the evidence.

Imposing ownership status on Griffith under the Act not only would extend liability to a noncustodial party but could also restrict Griffith's ability to rent his surrounding land or show his land to potential buyers, therefore placing an unreasonable burden on Griffith. This burden does not comport with the Act's intent, which is meant to impose a reasonable scope on liability. *Frost*, 296 Ill. App. 3d at 534. We should decline to extend the Act beyond its reasonable scope in order to punish the defendant. See *Frost*, 296 Ill. App. 3d at 534.