# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Howle v. Aqua Illinois, Inc.*, 2012 IL App (4th) 120207

---

| | |
|---|---|
| Appellate Court Caption | LYNDA S. HOWLE, Plaintiff-Appellant, v. AQUA ILLINOIS, INC., an Illinois Corporation, Defendant-Appellee, and ROBERT CHITWOOD, Defendant. |
| District & No. | Fourth District<br>Docket No. 4-12-0207 |
| Argued | October 18, 2012 |
| Filed | October 31, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a dog bite case arising from the injuries plaintiff suffered when she was attacked by a dog while attending a family gathering at the residence defendant rented on the premises of his employer's plant, the trial court properly dismissed the count alleging that defendant employer violated the Animal Control Act and properly granted summary judgment to the employer on the negligence count, since the employer did not "own" the dog for purposes of the Act and it did not retain control over the residence for purposes of the negligence claim. |
| Decision Under Review | Appeal from the Circuit Court of Vermilion County, No. 09-L-81; the Hon. Craig H. DeArmond, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal        William R. Tapella and Daniel C. Jones (argued), both of Hefner, Eberspacher & Tapella, LLC, of Mattoon, for appellant.

Michael R. Stiff (argued) and Mark A. Lichtenwalter, both of Spesia & Ayers, of Joliet, for appellee.

Panel        JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Appleton and Pope concurred in the judgment and opinion.

## OPINION

¶ 1        In September 2009, plaintiff, Lynda S. Howle, sued defendants, Aqua Illinois, Inc. (Aqua), and Robert Chitwood. Howle alleged, in part, that Aqua was liable under (1) section 16 of the Animal Control Act (Act) (510 ILCS 5/16 (West 2010)) (count II) and (2) the common-law tort of negligence (count IV) for injuries she sustained when Chitwood's dog "viciously attacked" her while on Aqua's property. (Howle's suit against Chitwood is not the subject of this appeal.)

¶ 2        In November 2009, Aqua filed a motion to dismiss both counts under section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2010)). Following a September 2010 hearing, the trial court entered a written order that (1) rejected Aqua's claim that both counts were subject to dismissal under section 2-615 of the Code (735 ILCS 5/2-615 (West 2010)), (2) dismissed count II pursuant to section 2-619(a)(9) of the Code (735 ILCS 2-619(a)(9) (West 2010)), and (3) denied Aqua's motion to dismiss count IV under section 2-619(a)(9) of the Code.

¶ 3        In November 2011, Aqua filed a motion for summary judgment as to count IV pursuant to section 2-1005 of the Code (735 ILCS 5/2-1005 (West 2010)). Following a December 2011 hearing, the trial court granted summary judgment in Aqua's favor.

¶ 4        Howle appeals, arguing that the trial court erred by granting Aqua's (1) motion to dismiss count II and (2) motion for summary judgment as to count IV. We disagree and affirm.

¶ 5                            I. BACKGROUND

¶ 6                    A. The Circumstances That Led to Howle's Suit

¶ 7        The following facts were gleaned from the parties' pleadings, depositions, affidavits, and other supporting documents filed in the trial court.

¶ 8        In August 2006, Aqua hired Chitwood as the distribution superintendent of its water-treatment plant (hereinafter, the Plant). Because Chitwood's responsibilities included

dispatching crews to handle emergencies, Aqua required him to reside within a 15-minute drive of the Plant. In December 2006, Chitwood accepted Aqua's oral offer to rent on a month-to-month basis a house that Aqua owned. That house, located in the rear of the Plant's premises, was surrounded by a barbed-wire fence that delineated the Plant's overall property. A single-gated, keypad entrance, which was constantly monitored by a Plant operator and numerous security cameras, provided the only access into the Plant.

¶ 9 Chitwood explained that he agreed to pay Aqua $535 per month to rent the home, two-car garage, driveway, shed, and yard that surrounded the home. A small concrete wall separated the yard from an employee parking lot, but otherwise, the home did not have fencing or any other structures segregating it from the rest of the Plant. Chitwood possessed an electronic transmitter that would open the gate to allow personal visitors onto the Plant's property or, alternatively, he could place a name on a list to alert the Plant operator of the expected visitor. Although a landscaping contractor mowed the residence, Aqua employees performed snow removal and general maintenance on the home. Neither contractors nor Aqua employees entered the residential boundaries uninvited.

¶ 10 Chitwood initially shared the home with his wife and their dog, Annie. In spring 2007, Chitwood acquired a dog named Marley, who was a "Dalmatian/Great Dane mix." Chitwood allowed Annie and Marley to roam freely about the Plant's premises. Sometime later, Marley approached the Plant's water treatment operator, Frances Richards, and began "snarling and growling" at her. Richards reported the incident to Aqua's vice president, Thomas Bruns, and its production manager, both of whom had supervisory authority over Chitwood. Both supervisors later informed Richards that they had spoken to Chitwood and told him that his dogs required supervision when they were outside his residence. (We note that in support of Aqua's motion to dismiss, Aqua attached a five-page affidavit from Bruns in which he asserts that Aqua had no ownership or control over the dog that injured Howle.)

¶ 11 Thereafter, Marley got into the Plant's main building through an open rear door. Richards grabbed an object and yelled at Marley to "get out!" Marley growled at Richards but quickly retreated. Richards noted that Chitwood was not present during that encounter. In a third confrontation, Richards was on the Plant's "catwalk," suspended about 30 feet above the ground, when Marley, who was accompanied by Chitwood down below, ran toward Richards and growled at her. Chitwood yelled at Marley to return but Marley did not comply. Marley retreated after Richards threw water down on Marley.

¶ 12 On August 13, 2008, Bruns wrote a memorandum entitled, "Disciplinary Meeting with Bob Chitwood," which documented a meeting conducted the previous day regarding an incident in which Marley approached the Plant's janitor, Charlie Miller, in a threatening way. Miller, who was not injured, threw a can at Marley before Marley retreated. After rejecting Chitwood's claim that a coyote was to blame, Bruns concluded his memorandum, as follows:

> "Because there have been previous incidents involving Chitwood's dogs, including one in broad daylight with me, I told Chitwood that this was his final warning concerning his dogs. If another incident occurs, either his dogs will have to be removed or he will have to move out of the [Plant's] house and find another place to live.
>
> [Chitwood] indicated that he understood completely and would not let it happen

again."

(The record does not show that Chitwood's other dog, Annie, was disturbing Aqua employees.)

¶ 13 Bruns acknowledged that Aqua had leverage over Chitwood in that it could have terminated his residency and employment if he did not comply with Aqua's demands. Bruns added that the intent of the meeting with Chitwood was to inform him that his dogs had to be restrained and remain on the residential property. Despite that intent, Bruns stated that Aqua did not impose a specific requirement upon Chitwood as to how he should restrain his dogs. Thereafter, Bruns requested that Plant personnel inform him if Chitwood's dogs were creating any sort of disturbance on or near Plant property.

¶ 14 In the fall of 2008–after Bruns issued the disciplinary notice–Chitwood's son, Justin, and his pit bull, Sage, moved in with the Chitwoods. At that time, Justin did not discuss Sage's temperament with Chitwood. Later, Chitwood's immediate supervisor, Joshua Gabehart, accepted Chitwood's invitation to play cards at his home. While there, Gabehart recalled petting Sage, who had jumped into his lap, as Marley lay at his feet. Gabehart stated that he understood that Sage was Justin's dog, adding that anytime he would see the three dogs outside Chitwood's home, they were on the residential property being supervised by Chitwood's wife.

¶ 15 On December 27, 2008, the Chitwoods hosted a family gathering at their home. In attendance were (1) Justin and his fiancée; (2) Chitwood's other son, Adam, and his wife; (3) Chitwood's sister, Sandra Elliott, and her sons, Robert and Scott; and (4) Scott's girlfriend, Howle. In addition, Adam brought three dogs, one of which was a "pit bull mix" called Sienna. That afternoon, Adam was bitten on the hand while attempting to stop a fight between Sienna and Marley. In addition, Sage became aggressive by growling at some of the guests as they were dining. At that point, Justin pulled Sage back and stated that Sage had bitten a friend on the hand.

¶ 16 Later that evening, Howle and Scott were in the garage, saying their goodbyes before leaving. Howle described what happened next, as follows:

"Scott and I were saying good-bye to [Chitwood] and I went to shake his hand. We were going to go inside and say good-bye ***, and as I was shaking [Chitwood's] hand and Sage was there, I got done shaking his hand, and I just tapped [Sage's] head–I didn't bend over or get into his face or nothing, and he just jumped up."

(The result of Sage's attack on Howle was a cheek tear that required 10 stitches to close and left a visible scar, as well as some cartilage loss to her left ear, which is irreparable.)

¶ 17 Scott, who witnessed the incident, recalled seeing Howle with a laceration on her cheek that was "completely wide open." Sandra immediately transported Scott and Howle to the hospital. As they waited in the emergency ward, Justin informed Scott, as well as other family members, that Sage had bitten another friend, but Justin did not elaborate.

¶ 18 In February 2009, Bruns sent Chitwood a "Notice of Intent to Terminate Tenancy," informing him to vacate the Plant's residential property before May 1, 2009.

¶ 19    B. Howle's Complaint, Aqua's Filings, and the Trial Court's Rulings

¶ 20    In September 2009, Howle filed a complaint against Aqua, alleging that Aqua was liable under (1) section 16 of the Act (count II) and (2) the common-law tort of negligence (count IV) for injuries she sustained when Sage "viciously attacked" her while on Aqua's property.

¶ 21    In November 2009, Aqua filed a motion to dismiss both counts pursuant to section 2-619.1 of the Code. Attached to its motion was an affidavit by Bruns, essentially claiming that Aqua "never owned or controlled any of the dogs owned by Chitwood or [Justin]" and although Aqua was aware that Chitwood had dogs on its premises, it had no knowledge of biting incidents prior to December 2008. Following a September 2010 hearing, the trial court entered a written order that (1) rejected Aqua's claim that both counts were subject to dismissal under section 2-615 of the Code, (2) dismissed count II pursuant to section 2-619(a)(9) of the Code, and (3) denied Aqua's motion to dismiss count IV under section 2-619(a)(9) of the Code. In dismissing count II, the court found that Aqua did not "own" Sage within the meaning of section 16 of the Act.

¶ 22    In November 2011, Aqua filed a motion for summary judgment as to Howle's negligence claim (count IV) pursuant to section 2-1005 of the Code. Specifically, Aqua argued that the record–even when viewed in the light most favorable to Howle–revealed that it did not (1) own Sage, (2) owe Howle a duty because it had no control over the area where the injury occurred, or (3) know about Sage's "vicious propensities." Following a December 2011 hearing, the trial court granted summary judgment in Aqua's favor.

¶ 23    This appeal followed.


¶ 24    II. ANALYSIS

¶ 25    The trial court granted Aqua's motion to dismiss count II (alleging a violation of the Act) under section 2-619(a)(9) of the Code and then later granted Aqua's motion for summary judgment regarding count IV (alleging negligence). We will discuss these rulings in turn.


¶ 26    A. Aqua's Motion To Dismiss Under Section 2-619(a)(9) of the Code

¶ 27    Regarding count II of the complaint, Howle contends that the "only issue that is disputed and relevant is whether Aqua qualifies as an 'owner' of the dog under the Act." In the trial court's written order granting Aqua's motion to dismiss count II under section 2-619(a)(9) of the Code, the court appears to agree with Howle's analysis, noting that Aqua maintains that, under the Act, it cannot be held responsible for the dog's actions because it is not the dog's "owner." For the reasons that follow, section 2-619(a)(9) of the Code was the wrong vehicle for Aqua to raise the issue of ownership in the trial court because that issue did not constitute "affirmative matter."


¶ 28    1. *"Affirmative Matter" Under Section 2-619(a)(9) of the Code*

¶ 29    Section 2-619(a)(9) of the Code provides as follows:

"(a) Defendant may, within the time for pleading, file a motion for dismissal of the action or for other appropriate relief upon any of the following grounds. If the grounds do not

appear on the face of the pleading attacked[,] the motion shall be supported by affidavit:

\* \* \*

(9) That the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2010).

¶ 30　　In *Smith v. Waukegan Park District*, 231 Ill. 2d 111, 120-21, 896 N.E.2d 232, 238 (2008), the Supreme Court of Illinois explained that " '[a]ffirmative matter' means some kind of defense 'other than a negation of the essential allegations of the plaintiff's cause of action.' [Citation.]" Citing Professor Richard Michael's treatise, the court further explained as follows:

"The standard articulation of 'affirmative matter' is:

'[A] type of defense that either negates an alleged cause of action completely or refutes crucial conclusions of law or conclusions of material fact unsupported by allegations of specific fact contained [in] or inferred from the complaint \*\*\* [not] merely evidence upon which defendant expects to contest an ultimate fact stated in the complaint.' 4 R. Michael, Illinois Practice § 41.7, at 332 (1989).

In fact, a defendant moving for dismissal under section 2-619(a)(2) otherwise admits the legal sufficiency of the plaintiff's cause of action." *Smith*, 231 Ill. 2d at 121, 896 N.E.2d at 238.

See also *Perkins v. Quinn*, 2012 IL App (1st) 113165, ¶ 30 ("In the context of section 2-619(a)(9), an affirmative matter is something in the nature of a defense which, although the moving party admits the legal sufficiency of the complaint, negates the cause of action completely or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint." (Internal quotation marks omitted.)). See also *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31 ("A section 2-619 motion to dismiss admits the sufficiency of the complaint, but asserts a defense outside the complaint that defeats it.").

¶ 31　　　　　2. *Aqua's Motion To Dismiss Under Section 2-619(a)(9) of the Code*
*Was Not Based Upon "Affirmative Matter"*

¶ 32　　In its motion to dismiss, Aqua did not argue that an affirmative matter independent of the complaint, such as immunity, *res judicata*, or a violation of the applicable statute of limitations, barred Howle's suit. Instead, Aqua argued that "when the facts alleged in [Howle's c]omplaint are examined, along with the additional undisputed factual matters asserted by Aqua in the affidavit and deposition testimony, \*\*\* there is no genuine issue of material fact as to whether Aqua placed itself in a position of control 'akin to an owner.' " In response, Howle argued that a jury should be allowed to determine whether Aqua was an " 'owner,' 'keeper,' or 'harborer' of the dogs at the time of the attack." These arguments addressed an essential issue regarding liability–namely, ownership of the offending dog–and amounted to nothing more than Aqua's negation of an essential element of Howle's complaint. See *Khan v. BDO Seidman, LLP*, 404 Ill. App. 3d 892, 908, 935 N.E.2d 1174, 1188 (2010) (" 'Affirmative matter' means a defense other than a negation of the essential

elements of the plaintiff's cause of action." (citing *Smith*, 231 Ill. 2d at 120-21, 896 N.E.2d at 238)). See also *Asset Acceptance, LLC v. Tyler*, 2012 IL App (1st) 093559, ¶ 23, 966 N.E.2d 1039 ("An affirmative matter encompasses any defense other than a negation of the essential allegations of the cause of action.").

¶ 33          3. *Aqua's Claimed "Affirmative Matter" Was Essentially*
                    *an Answer Denying the Complaint*

¶ 34      The cases discussed above define "affirmative matter" as any defense *other than* a negation of the essential allegations of the cause of action. That raises the question as to what term best describes a defendant's response that constitutes "a negation" of the essential allegations of the cause of action. In our opinion, the term that best fits is an "answer." This conclusion follows from what the Supreme Court of Illinois wrote in *People ex rel. Fahner v. Carriage Way West, Inc.*, 88 Ill. 2d 300, 307-08, 430 N.E.2d 1005, 1008 (1981), as follows:

> "The purpose of pleadings is to present, define and narrow the issues and limit the proof needed at trial. *** The object of pleadings is to produce an issue asserted by one and denied by the other so that a trial may determine the actual truth."

Citing the above case, the Second District explained the purpose of a pleading as follows: "A pleading produces an issue asserted by one side and denied by the other so that a trial may determine the actual truth." *Golf Trust of America, L.P. v. Soat*, 355 Ill. App. 3d 333, 336, 822 N.E.2d 562, 565 (2005). See also the following discussion of pleadings contained in Nichols Illinois Civil Practice:

> "A pleading consists of a party's formal allegations of claims or defenses.
>
> The primary purpose of pleadings is to apprise one's adversary and the court of the nature of the claim or defense asserted. Pleadings present, define, and narrow the issues and limit the proof to be submitted at trial and facilitate the specification of the real issues to be tried. A pleading produces an issue asserted by one side and denied by the other so that a trial may determine the truth." 2 Nichols Illinois Civil Practice § 26:1, at 6-7 (rev. 2011).

¶ 35      In *Winters v. Wangler*, 386 Ill. App. 3d 788, 898 N.E.2d 776 (2008), this court provided two-word descriptions not only to describe motions filed under sections 2-615 and 2-619 of the Code, but also to explain the differences between them, as follows:

> "When making a section 2-619(a) motion to dismiss, a defendant (for purposes of the motion) *admits* the legal sufficiency of the complaint, yet asserts the existence of an external defect or defense that defeats the cause of action. [Citations.] Essentially, the defendant is saying in such a motion, 'Yes, the complaint was legally sufficient, but an affirmative matter exists that defeats the claim.' [Citations.] This is why a section 2-619(a) motion is sometimes referred to as a 'Yes, but' motion.
>
> Conversely, in a section 2-615 motion, a party *denies* the legal sufficiency of the complaint. [Citations.] In other words, the defendant in such a motion is saying, 'So what? The facts the plaintiff has pleaded do not state a cause of action against me.' This

is why a section 2-615 motion is sometimes referred to as a 'So what' motion." (Emphasis in original.) *Winters*, 386 Ill. App. 3d at 792, 898 N.E.2d at 779.

¶ 36    In addition to the above two-word descriptions, we now add the two-word description of "Not true" for a pleading that is essentially an answer denying an allegation set forth in the complaint. Or, as we earlier described it, "a negation of an essential element of the plaintiff's cause of action."

¶ 37    That is the situation in the present case. Essentially, based in large measure upon Bruns' affidavit, Aqua answered Howle's allegation regarding the dog's ownership by asserting that it is "Not true." However, a claim concerning the negation of a plaintiff's pleadings–that is, a defendant's assertion of "Not true"–is appropriately resolved either at trial or in a fact-based motion, such as a motion for summary judgment, not in a motion to dismiss under section 2-619, which is a "Yes, but" motion.

¶ 38    4. *Where the Trial Court and the Parties Addressed Defendant's Motion To*
    *Dismiss Under Section 2-619(a)(9) of the Code as if It Were a Motion*
    *for Summary Judgment, the Appellate Court Will Elect To Do So as Well*

¶ 39    Both parties in this case made arguments to the trial court and to this court that we would normally hear in an appeal from a trial court's grant of a motion for summary judgment. That is, Aqua argued that this record showed no genuine issue of material fact was present regarding the issue of the dog's ownership and that Aqua was entitled to judgment as a matter of law. Howle disputed this claim, but the trial court agreed with Aqua. If Aqua had brought a motion for summary judgment as to count II of Howle's complaint that the court had granted, we would expect Howle on appeal, and Aqua, in response, to present the same arguments as they have here–that is, that based on the well-pleaded facts in the record and the reasonable inferences gleaned from those facts, did the court err by granting summary judgment in Aqua's favor? Indeed, at oral arguments in this case, both Aqua and Howle conceded that the trial court's dismissal of count II of Howle's complaint was based on a summary judgment standard, and neither party had any objection to our reviewing the court's ruling as if it had granted summary judgment regarding count II. Given their concessions, we analyze both of Howle's claims under that standard. See *Turner v. 1212 S. Michigan Partnership*, 355 Ill. App. 3d 885, 893, 823 N.E.2d 1062, 1070-71 (2005) (where the appellate court opted to address an argument the defendants' incorrectly raised in a section 2-619(a)(9) motion to dismiss as a section 2-1005 motion for summary judgment, noting that the plaintiff suffered no prejudice by the appellate court's doing so).

¶ 40                    B. Summary Judgment and the Standard of Review

¶ 41    "Summary judgment is appropriate where the pleadings, affidavits, depositions, and admissions on file, when viewed in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *West Bend Mutual Insurance v. Norton*, 406 Ill. App. 3d 741, 744, 940 N.E.2d 1176, 1179 (2010). We review *de novo* a trial court's ruling

on a motion for summary judgment. *Benson v. Stafford*, 407 Ill. App. 3d 902, 911, 941 N.E.2d 386, 397 (2010).

¶ 42                                   C. Howle's Statutory Claim

¶ 43    Howle argues that the trial court erred by granting Aqua's motion to dismiss count II because Aqua owned the offending dog as defined by section 16 of the Act. We disagree. (As explained earlier, we will review the trial court's ruling regarding count II as if the trial court had granted Aqua's motion for summary judgment as to that count.)

¶ 44    Section 16 of the Act provides, as follows:

"If a dog or other animal, without provocation, attacks, attempts to attack, or injures any person who is peaceably conducting himself or herself in any place where he or she may lawfully be, the owner of such dog or other animal is liable in civil damages to such person for the full amount of the injury proximately caused thereby." 510 ILCS 5/16 (West 2010).

¶ 45    Section 2.16 of the Act defines the term "owner" as follows:

" 'Owner' means any person having a right of property in an animal, or who keeps or harbors an animal, or who has it in his care, or acts as its custodian, or who knowingly permits a dog to remain on any premises occupied by him or her. 'Owner' does not include a feral cat caretaker participating in a trap, spay/neuter, return or release program." 510 ILCS 5/2.16 (West 2010).

¶ 46    "To prevail on a claim under the Act, a plaintiff must prove the following: (1) an injury caused by an animal owned by the defendant; (2) lack of provocation; (3) the peaceable conduct of the injured person; and (4) the presence of the injured person in a place where he has a legal right to be." (Internal quotation marks omitted.) *Kindel v. Tennis*, 409 Ill. App. 3d 1138, 1140, 949 N.E.2d 1119, 1121 (2011). Because "the overriding purpose of the Act is the protection of the public from harm, the Act imposes penalties against both the owner of the animal and anyone 'who places himself in a position of control akin to an owner.' " *Beggs v. Griffith*, 393 Ill. App. 3d 1050, 1054, 913 N.E.2d 1230, 1235 (2009) (quoting *Wilcoxen v. Paige*, 174 Ill. App. 3d 541, 543, 528 N.E.2d 1104, 1106 (1988)). However, "a factual and reasonable basis to impose liability" must exist. (Internal quotation marks omitted.) *Beggs*, 393 Ill. App. 3d at 1054, 913 N.E.2d at 1235.

¶ 47    As framed by the parties, the sole issue before us concerns ownership of the offending dog, Sage. Howle contends that although the Act defines owner as one who "keeps or harbors" an animal, it does not further define those terms. In *Steinberg v. Petta*, 114 Ill. 2d 496, 501, 501 N.E.2d 1263, 1265 (1986), the supreme court interpreted the phrase "[h]arbor[s] or keep[s]" as involving "some measure of care, custody, [and] control." Specifically, in reversing the trial court's finding that the absentee landlord harbored the tenant's offending dog within the meaning of the Act, the supreme court concluded that knowingly permitting a dog to be on the rented property was insufficient to establish ownership under the Act because ownership required evidence that the offending dog was under the defendant's care, custody, and control. *Steinberg*, 114 Ill. 2d at 502, 501 N.E.2d at 1266; *Cieslewicz v. Forest Preserve District*, 2012 IL App (1st) 100801, ¶ 13, 976 N.E.2d

370.

¶ 48    In this case, Howle asserts that Aqua demonstrated the requisite care, custody, and control over Sage in the following manner: (1) Aqua provided permanent shelter to Sage in the form of a house that it owned and rented to Chitwood; (2) the house was located on Aqua's property, surrounded by a chain-link fence with barbed wire, and one secure and monitored entrance; (3) specific Aqua employees were responsible for safety policies and procedures at the Plant; (4) Aqua employees performed snow removal, landscaping, and general maintenance on the rental property; (5) through Bruns, Aqua acknowledged that it possessed "leverage and authority" over Chitwood, which included mandating that Chitwood take specific steps to either remove the dogs or restrict their freedom if it desired to do so; (6) "Aqua was aware of the dangerous propensities of Chitwood's dogs"; and (7) in August 2008, Aqua informed Chitwood that if another incident occurred with his dogs, they would either have to be removed or he would have to make other living arrangements.

¶ 49    Our analysis of Howle's assertion is slightly complicated by the fact that the record clearly shows that the relationship between Aqua and Chitwood was twofold and occurred simultaneously–that is, at the time Sage bit Howle, Aqua was in an employer-employee relationship and a landlord-tenant relationship with Chitwood, both of which occurred within the confines of the Plant's property. See *Frost v. Robave, Inc.*, 296 Ill. App. 3d 528, 534, 694 N.E.2d 581, 585 (1998) ("To establish that one is a keeper of an animal it must be shown that the person had control over the animal at the time of the injury or immediately prior to the injury.").

¶ 50    Nevertheless, the undisputed evidence shows that the injury occurred at a private family gathering on residential property that Chitwood rented from Aqua. As previously explained, the supreme court has held that a landlord-tenant relationship, without more, is insufficient to establish ownership under the Act. See *Steinberg*, 114 Ill. 2d at 502, 501 N.E.2d at 1266. Howle relies on the "leverage and authority" she claims Aqua possessed over Chitwood. However, Howle's claim shows only that Aqua had a modicum of control over Chitwood by virtue of its employer-employee relationship, instead of a controlling interest in the dogs that inhabited the home Chitwood rented from Aqua.

¶ 51    In that vein, Aqua, as Chitwood's employer, simply warned him that it did not want his dogs to run freely outside the boundaries of the rented property because of employee complaints. In deference to Chitwood's status and rights as a tenant, Aqua refrained from mandating any aspect of Chitwood's interaction with his dogs while they remained on his rented property, including how Chitwood would confine his dogs to prevent further disturbance within the Plant. Here, the record before us is devoid of any allegations that Aqua (1) had a property interest in Chitwood's dogs; (2) housed or fed Chitwood's dogs; or (3) enjoyed any benefit by their existence, such as, for example, guarding the Plant. Indeed, with regard to the rented residence–where Howle's injury took place–the record, even when viewed in the light most favorable to Howle, shows that Aqua did not exercise any measure of care, custody, or control over Chitwood's dogs as contemplated by the Act. We therefore reject Howle's statutory claim.

¶ 52                                D. Howle's Negligence Claim

¶ 53        Howle also argues that the trial court erred by granting Aqua's motion for summary judgment on count IV, which alleged the common-law tort of negligence. Specifically, Howle contends that (1) Aqua owed her a duty to protect her from the dogs residing on Plant premises, (2) genuine issues of material fact exist as to whether Aqua knew of "the dogs'" dangerous propensities, and (3) genuine issues of material fact exist as to whether Chitwood was acting as Aqua's agent. We address Howle's contentions in turn.

¶ 54                             1. *The Common-Law Tort of Negligence*

¶ 55        In *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 22, the supreme court provided the following guidance concerning negligence claims:

> "To succeed in an action for negligence, the plaintiff must establish that the defendant owed a duty to the plaintiff, that defendant breached that duty, and that the breach proximately caused injury to the plaintiff. [Citation.] A legal duty refers to a relationship between the defendant and the plaintiff such that the law imposes on the defendant an obligation of reasonable conduct for the benefit of the plaintiff. [Citations.] Absent a duty, no recovery by the plaintiff is possible as a matter of law. [Citations.] The existence of a duty under a particular set of circumstances is a question of law for the court to decide." (Internal quotation marks omitted.)

¶ 56                          2. *Howle's Claim That Aqua Owed Her a Duty*

¶ 57        Howle contends that the trial court erred by granting summary judgment in Aqua's favor because Aqua owed her a duty to protect her from the dogs residing on Plant premises. We disagree.

¶ 58        "It is well settled in Illinois that a landlord is not liable for injuries caused by a defective or dangerous condition on premises leased to a tenant and under the tenant's control." *Gilley v. Kiddel*, 372 Ill. App. 3d 271, 275, 865 N.E.2d 262, 266 (2007). A lessor who relinquishes control of a property by leasing it to another owes no duty to a third party who is injured while on the leased property. *Klitzka v. Hellios*, 348 Ill. App. 3d 594, 597, 810 N.E.2d 252, 256 (2004). The rationale underlying this policy is that conveyance of the property ends the lessor's control over the premises, which is a prerequisite to the imposition of liability. *Gilley*, 372 Ill. App. 3d at 275, 865 N.E.2d at 267.

¶ 59        In *Klitzka*, 348 Ill. App. 3d at 595, 810 N.E.2d at 254, the Second District Appellate Court considered the following question, "[U]nder what circumstances does a landlord owe a duty of care to his tenant's invitees to prevent injury from an attack by an animal kept by the tenant on the leased premises?" In that case, the plaintiff brought a negligence action against the defendant-lessors, seeking damages for injuries her minor daughter suffered as a result of a dog bite when they visited the lessee's home. *Id*. In affirming the trial court's grant of summary judgment for the defendants, the Second District wrote the following:

> "We hold that a landlord owes no duty to a tenant's invitee to prevent injuries proximately caused by an animal kept by the tenant on the leased premises if the landlord

does not retain control over the area where the injury occurred. A landlord does not retain such control where he has the right to coerce the removal of the animal by threatening to terminate the tenancy." *Klitzka*, 348 Ill. App. 3d at 601, 810 N.E.2d at 259.

¶ 60　Howle claims that the evidence before us "shows that Aqua clearly retained and exerted control over the residential property as it related to the keeping of Chitwood's dogs." In support of that claim, Howle relies on the factors we have previously listed and considered in the context of her statutory claim (see *supra* ¶ 48). In summarizing the effect of those factors and in an attempt to distinguish *Klitzka*, Howle posits, as follows:

> "The case at bar differs markedly from the situation in *Klitzka*, as Aqua retained and exerted on-going [*sic*] control over Chitwood and his dogs, even when they were inside the residential premises. The fact that Aqua maintained such authority, even over events that occurred entirely inside of the residential premises, is most clearly seen in the fact that Chitwood's tenancy was terminated as a result of the attack on [Howle]."

¶ 61　We disagree with Howle's assessment and find the Second District's decision in *Klitzka* to be well reasoned and directly applicable to the facts before us. Here, the record shows that (1) Aqua rented the home at issue to Chitwood on a month-to-month basis, (2) Howle's injury occurred on the rental property, and (3) Aqua refrained from exercising any control on the rented property or the home's inhabitants, which included the offending dog. More important, we agree with the court in *Klitzka* that a landlord's ability to terminate the tenancy due to concerns about dogs residing with the tenant does not amount to control over the dogs. Thus, Aqua's ability to terminate Chitwood's tenancy (and the fact that it later did so) because of the conduct of his dogs does not constitute the requisite control that imposes a duty upon Aqua to Howle.

¶ 62　　　　　　3. *Howle's Claim Regarding the Dogs' Dangerous Propensities*

¶ 63　Howle next contends that the trial court erred by granting summary judgment in Aqua's favor because genuine issues of material fact exist as to whether Aqua knew of "the dogs' " dangerous propensities. We disagree.

¶ 64　As we have already concluded, Aqua was properly granted summary judgment with regard to Howle's negligence claim because it did not retain control over the home it rented to Chitwood. As such, even if Aqua were aware of Sage's aggressiveness, a duty, and by extension, liability, does not flow because Aqua had no control over what occurred on Chitwood's rented property. See *Klitzka*, 348 Ill. App. 3d at 597, 810 N.E.2d at 256 (concluding that because the defendants did not retain any control in the leased premises, summary judgment in their favor was appropriate even if the defendants could have foreseen that the dog would bite another person).

¶ 65　Howle's reliance on *Lucas v. Kriska*, 168 Ill. App. 3d 317, 320, 522 N.E.2d 736, 737 (1988), for the proposition that prior knowledge of the animal's propensity to cause injury must be shown is misplaced, because that case is distinguishable. The issue addressed in *Lucas* was whether the plaintiff–whose minor daughter was bitten by a dog on the defendant's property–was required to present evidence that the landowner knew of a dog's vicious propensities given that the landowner did not own the offending dog but allowed it

-12-

to roam on her land. *Id*. The appellate court answered that she did, noting that such evidence was required "to impose liability on someone other than the dog's owner or keeper under principles of common law negligence." *Id*.

¶ 66     The record before us shows that Aqua was on notice that Marley was the problematic animal and, as such, took the appropriate step to ensure that Marley did not traverse its property unattended, which, based on the record, appears to have been successful. Marley, however, was not the offending dog, and even if it were relevant to this negligence claim–which it is not–Howle failed to present any evidence that Aqua knew that Sage, the offending dog, was aggressive or prone to biting. See *Goennenwein v. Rasof*, 296 Ill. App. 3d 650, 654, 695 N.E.2d 541, 544 (1998) ("It is presumed that a dog is tame, docile, and harmless absent evidence that the dog has demonstrated vicious propensities.").

¶ 67                              4. *Howle's Claim of Agency*

¶ 68     Howle also contends that the trial court erred by granting summary judgment in Aqua's favor because genuine issues of material fact exist as to whether Chitwood was acting as Aqua's agent. Alluding to Aqua's August 2008 disciplinary memo, Howle asserts that "Chitwood's acts, or failures to act, to restrain and control his dogs at the time of the occurrence came at a time when he was acting within the scope of his authority as an Agent of Aqua." We disagree and note that Howle's claim attempts to obfuscate Aqua's intent by conflating Aqua's employer-employee relationship with Chitwood with Aqua's landlord-tenant relationship. We reject any notion that Aqua's warning that further encounters with Chitwood's dogs and Aqua employees would result in removal of the dogs or rental termination was anything other than Aqua, a landlord, communicating with its tenant, Chitwood. In this regard, we agree with the court's finding at the December 2011 hearing on Aqua's motion for summary judgment that Howle failed to present any evidence that creates a genuine issue of material fact as to whether Aqua's memorandum was proffered under its agent-principal relationship with Chitwood.

¶ 69                              III. EPILOGUE

¶ 70                 A. Combined Motions Under Section 2-619.1 of the Code

¶ 71     Section 2-619.1 of the Code provides, as follows:

"Combined motions. Motions with respect to pleadings under Section 2-615, motions for involuntary dismissal or other relief under Section 2-619, and motions for summary judgment under Section 2-1005 may be filed together as a single motion in any combination. A combined motion, however, shall be in parts. Each part shall be limited to and shall specify that it is made under one of Sections 2-615, 2-619, or 2-1005. Each part shall also clearly show the points or grounds relied upon under the Section upon which it is based." 735 ILCS 5/2-619.1 (West 2010).

¶ 72     Although section 2-619.1 of the Code permits a movant to combine separate claims brought under section 2-615, 2-619, or 2-1005 into one filing, it prohibits the commingling of those distinctive claims. See *Jenkins v. Concorde Acceptance Corp.*, 345 Ill. App. 3d 669,

674, 802 N.E.2d 1270, 1276 (2003) (section 2-619.1 does not authorize hybrid motion practice; defendants erred by raising affirmative matters pertinent to a section 2-619 motion in their section 2-615 motion to dismiss); see also *Green v. Trinity International University*, 344 Ill. App. 3d 1079, 1086, 801 N.E.2d 1208, 1214 (2003) ("[W]hen presenting a hybrid motion to dismiss[,] it is improper to submit evidentiary material going to the truth of the allegations contained in the complaint because a motion pursuant to either section 2-615 or 2-619 concedes the truth of all well-pleaded allegations."). Further, a defendant's attempt to argue multiple claims in a single motion might serve only to complicate and confuse. See *Higgins v. Richards*, 401 Ill. App. 3d 1120, 1125, 937 N.E.2d 215, 220 (2010) ("Ostensibly, section 2-619.1 was the legislature's response to the fact that '[r]eviewing courts have long disapproved of [the] slipshod practice' of filing hybrid motions to dismiss pursuant to both sections 2-615 and 2-619, because those motions 'cause[ ] unnecessary complication and confusion.' " (quoting *Talbert v. Home Savings of America, F.A.*, 265 Ill. App. 3d 376, 379, 638 N.E.2d 354, 357 (1994))). See also *Kovilic v. City of Chicago*, 351 Ill. App. 3d 139, 143, 813 N.E.2d 1046, 1050 (2004) (noting that raising both section 2-615 and 2-619 claims in a hybrid motion under section 2-619.1 "often causes unneeded complication and confusion").

¶ 73       Because section 2-619.1 of the Code explicitly requires that a motion combining both sections 2-615 and 2-619 (1) *must* be in parts, (2) *must* "be limited to and shall specify that it is made under" either section 2-615 or 2-619, and (3) *must* "clearly show the points or grounds relied upon under the [s]ection upon which it is based," trial courts should not–and need not–accept for consideration combined motions under section 2-619.1 that do not meet these statutory requirements. To avoid unnecessary complications and confusion (see *Higgins*), trial courts should *sua sponte* reject such motions and give the defendants who filed them the opportunity (if they wish) to file a section 2-619.1 motion that meets the statutory requirements. Or, of course, such defendants may choose to file separate motions under sections 2-615 and 2-619, thereby avoiding any improper commingling of their claims.

¶ 74                    B. The Section 2-619.1 Motion Aqua Filed in This Case

¶ 75       We provided the previous discussion about the requirements of section 2-619.1 of the Code because Aqua's November 2009 motion to dismiss, purportedly brought pursuant to that section, did not meet that section's requirements. Specifically, Aqua's 19-page motion (1) was not segregated into parts, (2) did not specify which portions were claims brought under section 2-615 or section 2-619, and (3) did not clearly show the points or grounds relied upon under the section on which they were based. The trial court in this case could have denied Aqua's motion solely on this basis.

¶ 76                                   IV. CONCLUSION

¶ 77       For the reasons stated, we affirm the trial court's judgment.

¶ 78       Affirmed.

-14-