# Illinois Official Reports

## Appellate Court

---

### *People v. Winchester*, 2016 IL App (4th) 140781

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK N. WINCHESTER, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-14-0781 |
| Filed | November 30, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 13-CF-1192; the Hon. Richard P. Klaus, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Ellen J. Curry, and Ian C. Barnes (argued), of State Appellate Defender's Office, of Mt. Vernon, for appellant.<br><br>Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and Julia Kaye Wykoff (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE KNECHT delivered the judgment of the court, with opinion.<br>Justices Steigmann and Appleton concurred in the judgment and opinion. |

**OPINION**

¶ 1    A jury convicted defendant, Mark N. Winchester, of aggravated driving under the influence of alcohol (aggravated DUI) (625 ILCS 5/11-501(d)(2)(B) (West 2012)), and the trial court sentenced him to six years' imprisonment. Defendant appeals, claiming the trial court erred when it (1) denied his motion to suppress evidence and (2) relied on improper aggravating factors already inherent in the charged offense when it sentenced him. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    On July 24, 2013, the State charged defendant by information with one count of aggravated DUI (625 ILCS 5/11-501(d)(2)(B) (West 2012)). The information alleged defendant drove or was in actual physical control of a motor vehicle at a time when he was under the influence of alcohol and he had two prior driving under the influence (DUI) convictions. The charges arose from an encounter with University of Illinois police officer Ryan Snow. The facts are undisputed for purposes of this appeal.

¶ 4                 A. Motion "To Quash Arrest" and Suppress Evidence

¶ 5    On September 19, 2013, defendant filed a motion "to quash arrest" and suppress evidence, arguing he was unlawfully seized by Snow. At the hearing on the motion, Snow provided the following testimony.

¶ 6    Snow testified that on July 2, 2013, at approximately 1:20 a.m., he was on duty, in uniform, armed, and in an unmarked patrol car. Driving westbound on Kirby Avenue, he observed a Ford Explorer driving eastbound. The vehicle caught Snow's attention because it was the only vehicle on the road. While passing the Ford Explorer, Snow observed defendant "[with] both hands on the wheel, *** griping tightly, leaning forward in [his] seat, and looking straight ahead" (described as "tunnel vision"). Snow turned off a side street and ended up two blocks behind the Ford Explorer. Snow followed the vehicle for over a mile, until it pulled into an apartment complex parking lot. Snow pulled into an adjacent lot to turn around and exit the area. No traffic violations had occurred.

¶ 7    No one exited the vehicle, and Snow decided he would "wait and see why that person would not exit their vehicle after parking in an area like that." After five minutes, Snow exited his patrol car and approached the Ford Explorer. He approached the vehicle and observed defendant slumped over the driver's seat with keys in his right hand and a bottle of tea in his left hand. He attempted to wake defendant by knocking on the window and yelling. He received no response. Snow radioed for an assisting officer to set up his response time because he did not know if defendant "had a medical emergency at that time." Snow continued to knock on the window and could not wake defendant.

¶ 8    Snow testified defendant eventually started to move around. At this time, Snow was still unsure of his status or health. Defendant then held up his right hand, still grasping the keys, raised his middle finger, and said, "no policia." Snow asked defendant to open the door so he could speak to him. Snow remained concerned about defendant's medical status. When defendant opened the door, Snow detected the odor of an alcoholic beverage emitting from the vehicle. Defendant attempted to exit the vehicle. Defendant was lethargic and slow moving,

slurred his speech, and had difficulty standing. Snow asked defendant to sit back down because he was concerned defendant would fall.

¶ 9 In his motion "to quash arrest" and suppress evidence, defendant argued he did not consent to the interaction with Snow and Snow did not have a legal basis for conducting the stop. Further, defendant argued the community caretaking exception was inapplicable because Snow was investigating a crime "on a mere hunch *** [d]efendant had committed, was in the process of committing, or was about to commit a crime or traffic violation." Defendant requested the stop and all that followed be suppressed.

¶ 10 The trial court denied the motion. The court stated, in relevant part, as follows:

"When [Snow] decided to follow the [d]efendant's vehicle, [he] was engaged in what police officers do. The [d]efendant took an unusual route, although that phrase has not been described here, it certainly is on the video, a fact with which I agree, to get to where he got to. At no time did the officer attempt to effectuate a stop. He probably wouldn't have had a basis at that [point] to effectuate a stop. He simply followed him. That's what police officers do.

The [d]efendant pulled into a parking lot. The police officer pulled into a different lot and watched. Also, what police officers do. He never effectuated a stop ***. All he did was watch. And nothing happened for five minutes. At that point, he decided that at 1:30 in the morning, nobody's exited the vehicle, he's going to check on the welfare of the [d]efendant.

You can call it a consensual stop, you can call it a community caretaker function. The Illinois Supreme Court's not wild about the latter phrasing, but having said that, he walks up to the vehicle and he sees a citizen slumped over the wheel. And there's been no testimony to the contrary, that the [d]efendant was either unconscious or asleep or whatever, in a vehicle. He then proceeded to do exactly what he's supposed to do, which is, check on the welfare of the citizen.

At that point, there's been no seizure. At that point, there's been no *Terry* stop [see *Terry v. Ohio*, 392 U.S. 1 (1968)]. At that point, all the officer has engaged in is a consensual encounter situation, in the Court's opinion."

¶ 11                                                     B. Trial

¶ 12 Snow testified at defendant's trial with only slight variations. Snow testified defendant's driving route led him to believe he was attempting to elude him. Once defendant awakened, defendant extended his middle finger and said, "f*** you, no policia." When defendant opened his door, he explained his girlfriend was driving the car and she went inside the apartment. Defendant argued he was not in the driver's seat (Snow questioned defendant as he was sitting in the driver's seat). When Snow's assisting officer arrived, he asked defendant to step to the rear of the vehicle to perform field sobriety tests to make sure he was okay. Snow believed defendant was driving under the influence. Snow administered three tests: the horizontal gaze nystagmus, walk-and-turn, and one-legged stand. Defendant had difficulty following instructions and could not successfully complete any of the tests. Snow placed him under arrest, and defendant refused to submit to a Breathalyzer. The jury convicted defendant of aggravated DUI (625 ILCS 5/11-501(d)(2)(B) (West 2012)).

C. Posttrial Motion

¶ 14     On August 20, 2014, defendant filed a posttrial motion, arguing the trial court erred when it denied his motion to suppress evidence. Defendant argued, among other things, Snow followed his vehicle because he believed the driver was leaning forward and focused extremely hard on the task of driving, and this was not a valid basis for Snow to follow him and eventually approach his vehicle (citing *People v. Swisher*, 207 Ill. App. 3d 125, 128-29, 565 N.E.2d 281, 283 (1990)). The court denied the motion.

¶ 15                                        D. Sentencing

¶ 16     The State recommended defendant be sentenced to the maximum term of seven years' imprisonment. The State argued, "the statutory factor in aggravation is the [d]efendant's criminal history. The [d]efendant is not here for the first or second time that he's done this but the third time he has committed the offense of driving under the influence. Most notably the last time was 2010 *** and the time before that was 2005. Both times previously he was granted terms of probation in those cases." The State went on to discuss defendant's prior theft conviction with multiple petitions to revoke and his eventual prison sentence. It concluded, "[g]iven his criminal history and the [d]efendant's repeated violation of the DUI statute, I'd ask that the [d]efendant be sentenced to a period of seven years in [prison]."

¶ 17     The trial court sentenced defendant to six years' imprisonment. In imposing its sentence, the court stated it considered "the presentence report, the drug and alcohol evaluation, the evidence submitted in advance in mitigation, [the parties'] arguments, [and] the [d]efendant's exercise of his right of allocution." The court also detailed defendant's "record of criminality" and stated:

> "The State articulated that one of the factors in aggravation present is the [d]efendant's record of criminality. I would note in 2004, a conviction was entered as to Class 3 theft in Vermilion County and that he was originally placed on 24 months of probation, that a [petition to revoke] was filed, that he was ultimately resentenced to 30 months of probation and as part of that probation *** [he] was ordered to obtain an alcohol and drug abuse evaluation and complete treatment. He was ultimately then subject to another petition to revoke in the same case, resentenced to an additional term of probation, ultimately another [petition to revoke was] filed in the same case and then [he] was sentenced to three months in the Department of Corrections.
>
>     The [d]efendant has shown an inability to follow court orders and to obey the terms of a community-based sentence. The [d]efendant has continued to drive without a license. *The [d]efendant has continued to drink and drive without a license.* The [d]efendant is a danger to the public and must be deterred from the conduct that he has engaged in and a message of deterrence must also be used to prevent similarly situated people from engaging in this offense." (Emphasis added.)

¶ 18     This appeal followed.

¶ 19                                        II. ANALYSIS

¶ 20     On appeal, defendant raises two main arguments. First, defendant contends the trial court erred when it denied his motion to suppress evidence because he was unlawfully seized by Snow and the community caretaking exception is inapplicable. Second, defendant argues the

trial court relied on improper aggravating factors inherent in the offense when it sentenced him. The State maintains the trial court properly denied defendant's motion because the community caretaking exception applied and court did not err when it sentenced him. We address each contention in turn.

¶ 21                                    A. Motion To Suppress Evidence

¶ 22    Defendant titled his motion as a "Motion to Quash Arrest and Suppress Evidence." This title is improper because defendant is not challenging his arrest as void but challenging whether the arresting officer had probable cause or reasonable suspicion. A proper title for such a motion is "motion to suppress evidence." See *People v. Hansen*, 2012 IL App (4th) 110603, ¶ 63, 968 N.E.2d 164 ("defendants should stop filing such motions and should instead file only motions to suppress evidence"). We will treat it as a motion to suppress, but we believe the issue deserves additional comment. The motion was improper in form, defendants should stop filing such motions, and trial courts should no longer accept such motions.

¶ 23    Four-and-a-half years ago, this court in *Hansen* pointed out filing a "motion to quash arrest" was meaningless when the defendant was really filing a motion to suppress evidence based upon the defendant's claim that the arresting officer improperly stopped the defendant's vehicle. In *Hansen*, this court explained suppressing the evidence obtained by the police as a result of an improper stop is the entirety of the relief to which a defendant is entitled and the only relief provided for in section 114-12 of the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/114-12 (West 2010)), which is titled, "Motion to Suppress Evidence Illegally Seized." We concluded our discussion in *Hansen* by noting a "motion to quash arrest" (1) is unnecessary to achieve a defendant's goal of suppressing evidence, (2) adds nothing to an analysis of whether a motion to suppress based upon an allegedly illegal search or stopping should be granted, and (3) only adds confusion to such an analysis. *Hansen*, 2012 IL App (4th) 110603, ¶ 63, 968 N.E.2d 164.

¶ 24    Since writing in *Hansen* of our disapproval of "motions to quash arrest," this court has frequently cited *Hansen* and reiterated that criticism. See *People v. Carroll*, 2012 IL App (4th) 110028-U, ¶ 97; *People v. Hart*, 2012 IL App (4th) 110738-U, ¶ 20; *People v. Raithel*, 2012 IL App (4th) 110712-U, ¶ 22; *People v. Cartmill*, 2013 IL App (4th) 120820-U, ¶ 7; *People v. Gaytan*, 2013 IL App (4th) 120217, ¶ 5, 992 N.E.2d 17, *rev'd on other grounds*, 2015 IL 116223, 32 N.E.3d 641; *People v. Allen*, 2013 IL App (4th) 120818-U, ¶ 38; *People v. Campbell*, 2016 IL App (4th) 131083-U, ¶¶ 30-31.

¶ 25    In *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 59, 996 N.E.2d 1227, this court again addressed that subject and, quoting extensively from *Hansen*, explained what a motion to suppress filed pursuant to section 114-12 of the Criminal Code "must clearly set forth *at a minimum*" (emphasis in original)—namely, (1) the title of the motion should be "motion to suppress evidence," (2) the motion to suppress must clearly identify the evidence sought to be suppressed, and (3) the motion must state facts showing wherein the search and seizure were unlawful.

¶ 26    In the present case, defendant filed a "motion to quash arrest" in September 2013, instead of filing a proper "motion to suppress evidence." That improper motion was filed almost 1½ years after our decision in *Hansen*. It appears this court's message is not getting out regarding the inappropriateness of filing "motions to quash arrest."

¶ 27    One way to get defense counsel to stop filing "motions to quash arrest" when they really mean to file "motions to suppress evidence" is for trial courts to *sua sponte* reject such motions on their face and to direct defense counsel to file a proper motion to suppress if counsel wishes to do so. This court previously took that action where counsel were filing improper motions to dismiss in civil cases.

¶ 28    In *Howle v. Aqua Illinois, Inc.*, 2012 IL App (4th) 120207, 978 N.E.2d 1132, this court addressed the ongoing problem of improper motions to dismiss being filed under section 2-619.1 of the Code of Civil Procedure (Civil Code) (735 ILCS 5/2-619.1 (West 2010)). We noted section 2-619.1 of the Civil Code permitted counsel to file a combined motion to dismiss under section 2-615 and section 2-619 of the Civil Code but required each part of such a motion be limited to—and specify that it is made under—section 2-615 or section 2-619. *Howle*, 2012 IL App (4th) 120207, ¶ 72, 978 N.E.2d 1132. Section 2-619.1 of the Civil Code also requires each part of such a combined motion to "also clearly show the points or grounds relied upon under the Section upon which it is based." 735 ILCS 5/2-619.1 (West 2010).

¶ 29    In recognition of the ongoing problem and potential for confusion, this court wrote, "trial courts should not—and need not—accept for consideration combined motions under section 2-619.1 that do not meet these statutory requirements. To avoid unnecessary complications and confusion ***, trial courts should *sua sponte* reject such motions and give the defendants who filed them the opportunity (if they wish) to file a section 2-619.1 motion that meets the statutory requirements." *Howle*, 2012 IL App (4th) 120207, ¶ 73, 978 N.E.2d 1132; see also *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 21, 988 N.E.2d 984 (recommending trial courts take similar measures as those described in *Howle*); *Lavite v. Dunstan*, 2016 IL App (5th) 150401, ¶ 21, 58 N.E.3d 1270 (recommending trial courts take similar measures as those described in *Reynolds*).

¶ 30    The trial courts that hear criminal cases should do the same thing. If a trial court receives a "motion to quash arrest," it should not accept it for consideration and should point out to counsel the motion is inappropriate for the reasons this court explained in *Hansen* and *Ramirez*. The court should then give the counsel who filed the inappropriate motion the opportunity to file a proper motion to suppress under section 114-12 of the Criminal Code. Motion practice is sometimes complicated, but it need not be. "Motion to quash arrest" is an arcane phrase that has a ring of authenticity but is actually meaningless verbiage.

¶ 31    Next, we address the proper standard of review for motions to suppress evidence. "[W]e review a trial court's ruling on a motion to suppress under a two-part standard: the trial court's factual findings will be reversed only if they are against the manifest weight of the evidence, but the trial court's ultimate ruling on whether suppression is warranted is reviewed *de novo*." *People v. Chambers*, 2016 IL 117911, ¶ 76, 47 N.E.3d 545.

¶ 32    Police-citizen encounters have been divided into three tiers: (1) arrests of a citizen, which must be supported by probable cause; (2) brief investigative detentions (*Terry* stops) supported by a reasonable, articulable suspicion of criminal activity; and (3) consensual encounters, which do not involve coercion or detention. *People v. Luedemann*, 222 Ill. 2d 530, 544, 857 N.E.2d 187, 196 (2006). Defendant argues he was unlawfully seized as (1) Snow did not have probable cause, (2) Snow did not have a reasonable, articulable suspicion of criminal activity, and (3) he declined Snow's encounter. In determining whether defendant's fourth amendment rights were violated, we must first determine whether he was seized.

¶ 33                                          1. *Seizure*

¶ 34        Defendant argues he was seized when Snow asked him to open his car door. A person is seized for fourth amendment purposes when an officer, by means of physical force or show of authority, has restrained the individual's liberty. *People v. Gherna*, 203 Ill. 2d 165, 177, 784 N.E.2d 799, 807 (2003). The parties cite different tests to determine whether an individual is seized for fourth amendment purposes. The State suggests the appropriate test is whether a reasonable person would have believed he was not free to leave, citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Defendant argues the proper test is whether a reasonable person, taking into account all the circumstances of the incident, would feel free to decline the officer's requests or otherwise terminate the encounter, citing *Luedemann*, 222 Ill. 2d at 550-51, 857 N.E.2d at 200.

¶ 35        Our supreme court has held "in situations in which the person's freedom of movement is restrained by some factor independent of police conduct the 'free to leave' test is inapplicable and 'the appropriate inquiry is whether a reasonable person would feel free to decline the [officer's] requests or otherwise terminate the encounter.' " *Luedemann*, 222 Ill. 2d at 550, 857 N.E.2d at 200 (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). When a person is seated in a parked vehicle, the appropriate test to determine if an individual has been seized is "whether a reasonable person in defendant's position would have believed he was free to decline [the officer's] requests or otherwise terminate the encounter." *Luedemann*, 222 Ill. 2d at 550-51, 857 N.E.2d at 200. "The analysis requires an objective evaluation of the police conduct in question and does not hinge upon the subjective perception of the person involved." *Luedemann*, 222 Ill. 2d at 551, 857 N.E.2d at 200.

¶ 36        There are four factors indicating a seizure may have occurred: "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Luedemann*, 222 Ill. 2d at 553, 857 N.E.2d at 201. These factors are not exhaustive, and a seizure can be found based on similar coercive police behavior. *Luedemann*, 222 Ill. 2d at 557, 857 N.E.2d at 203.

¶ 37        Defendant relies on *Gherna* for his assertion he was seized when Snow asked him to open his car door. In *Gherna*, two uniformed officers were on bicycle patrol and observed two females sitting in a parked pickup truck in an apartment complex parking lot. *Gherna*, 203 Ill. 2d at 168, 784 N.E.2d at 801. Officer Wasson testified, as he and his partner passed the truck, he saw a bottle of beer in the center console. *Gherna*, 203 Ill. 2d at 168, 784 N.E.2d at 801. Wasson stated the passenger appeared to be young, and he suspected possible underage drinking. *Gherna*, 203 Ill. 2d at 168, 784 N.E.2d at 801. The officers stopped to identify the two females. *Gherna*, 203 Ill. 2d at 168, 784 N.E.2d at 801. Wasson approached the driver's side of the truck, and the other officer approached the passenger side of the truck. *Gherna*, 203 Ill. 2d at 185, 784 N.E.2d at 811. The defendant, the driver of the truck, was over the age of 21, and the passenger was her 13-year-old daughter. *Gherna*, 203 Ill. 2d at 168, 784 N.E.2d at 801-02. The officers examined the beer bottle and determined it was unopened and in its original container. *Gherna*, 203 Ill. 2d at 168, 784 N.E.2d at 802. The officers began " 'casually talking' " with defendant, and Wasson observed defendant became " 'very nervous.' " *Gherna*, 203 Ill. 2d at 168, 784 N.E.2d at 802.

¶ 38        As Wasson conversed with the defendant, he noticed an item resembling a credit card under her left thigh. *Gherna*, 203 Ill. 2d at 168, 784 N.E.2d at 802. He asked the defendant

about the card, and she showed it to him. *Gherna*, 203 Ill. 2d at 168, 784 N.E.2d at 802. Wasson identified the card as an Illinois Link card, which was in the name of Lowell Briggs. *Gherna*, 203 Ill. 2d at 168, 784 N.E.2d at 802. Wasson asked the defendant how she came into possession of the card, and she claimed she did not know how the card got into her vehicle. *Gherna*, 203 Ill. 2d at 168, 784 N.E.2d at 802. Wasson then asked the defendant to step out of the vehicle to speak with him outside of the presence of her 13-year-old daughter. *Gherna*, 203 Ill. 2d at 169, 784 N.E.2d at 802. Wasson asked the defendant if there were any additional items in the vehicle belonging to Lowell Briggs. *Gherna*, 203 Ill. 2d at 169, 784 N.E.2d at 802. The defendant told Wasson the officers were " 'free to look.' " *Gherna*, 203 Ill. 2d at 169, 784 N.E.2d at 802. The officers did not search the vehicle at this time. *Gherna*, 203 Ill. 2d at 169, 784 N.E.2d at 802. Wasson asked the defendant if she had any illegal drugs or narcotics, to which she responded in the negative. *Gherna*, 203 Ill. 2d at 169, 784 N.E.2d at 802. Wasson paused for about 10 seconds, and the defendant began emptying her pockets, at which point a small, clear bag, which contained several yellowish-white rocks later tested and identified as cocaine, fell on the ground. *Gherna*, 203 Ill. 2d at 169, 784 N.E.2d at 802. The defendant was arrested and charged with unlawful possession of a controlled substance. *Gherna*, 203 Ill. 2d at 167, 784 N.E.2d at 801.

¶ 39    The defendant filed a motion to suppress evidence, alleging her fourth amendment rights were violated because she was searched without a warrant and without probable cause. *Gherna*, 203 Ill. 2d at 169, 784 N.E.2d at 802. More specifically, the defendant argued the officers' initial stop amounted to a *Terry* stop and, once the officers determined there was no underage drinking or open alcohol violations, their investigation should have ceased. *Gherna*, 203 Ill. 2d at 169, 784 N.E.2d at 802. The State argued the entire encounter was consensual and, therefore, the defendant's fourth amendment rights were not implicated. *Gherna*, 203 Ill. 2d at 172, 784 N.E.2d at 804. The trial court granted the defendant's motion and concluded her continued detention post-*Terry* stop constituted an unlawful seizure. *Gherna*, 203 Ill. 2d at 172, 784 N.E.2d at 804. The trial court noted:

> " 'Upon asking the defendant to leave the car so as to conduct a conversation outside the presence of her daughter, the defendant was unlawfully detained. The court rejects the State's position that this was a mere request because a person in the defendant's position could reasonably believe that upon being asked to step away from the car, she was not free to leave. Accepting the testimony that the defendant thereafter gave her consent to search, the court finds such consent was tainted as a product of that unlawful detention.' " *Gherna*, 203 Ill. 2d at 172-73, 784 N.E.2d at 804.

¶ 40    On appeal, the trial court's judgment was reversed. The appellate court found the entire encounter between the defendant and the officers was consensual and, therefore, defendant was not seized. *Gherna*, 203 Ill. 2d at 173, 784 N.E.2d at 804. The Illinois Supreme Court reversed the appellate court's decision, concluding the trial court was correct. The supreme court explained:

> "Under the totality of the circumstances at bar, we conclude that the presence and positioning of the officers with their bicycles on either side of defendant's vehicle, combined with Officer Wasson's request to defendant to produce the bottle of beer for examination after questioning defendant and her daughter about their identities, constituted an official show of authority to which a reasonable innocent person would feel compelled to submit. At the time Officer Wasson asked defendant to hand him the

- 8 -

bottle of beer, a reasonable innocent person in defendant's position would not have felt 'free to decline the officers' requests or otherwise terminate the encounter.' [Citation.] At that instant, defendant's movement was restricted: the positioning of the officers and their bicycles prevented defendant from either exiting the vehicle or driving the vehicle away from the scene. This blocked movement, combined with the request to examine the bottle of beer on the heels of other questioning, would ' "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." ' [Citations.]" *Gherna*, 203 Ill. 2d at 180, 784 N.E.2d at 808.

¶ 41 Defendant suggests his case is similar to *Gherna* because "he was left with the dilemma of either complying with the officer's request or sitting awkwardly in his vehicle with an officer standing just outside of it." Additionally, he argues, similar to *Gherna*, Snow never told him he was free to go or otherwise free to not comply with his request. Defendant suggests his case has an additional factor demonstrative of a seizure in that he expressed in unequivocal terms he did not want to speak or interact with Snow when he extended his middle finger and said "no policia." He argues Snow persisted after being told he was not welcome, which conveyed a message compliance with his request was required (citing *Bostick*, 501 U.S. at 437). In response, the State does not argue whether defendant was seized, but it suggests if he was, the community caretaking exception applies.

¶ 42 We first address whether defendant was seized before addressing whether the community caretaking exception applies. See *Luedemann*, 222 Ill. 2d at 548, 857 N.E.2d at 198-199 ("[T]he 'community caretaking' doctrine *** is invoked to validate a search or seizure as reasonable under the fourth amendment. It is not relevant to determining whether police conduct amounted to a seizure in the first place.").

¶ 43 We disagree with the trial court's conclusion this was a consensual encounter and no seizure occurred. Based on the record, it appears defendant was seized when Snow asked him to open the door to his vehicle. Nothing in the record indicates this was a consensual encounter. As stated in *Gherna*, "an individual is not seized for fourth amendment purposes when police ask questions of that individual, including a request for identification, so long as the officers do not convey by their words or actions to the person being questioned that compliance with their requests is required." *Gherna*, 203 Ill. 2d at 179, 784 N.E.2d at 807.

¶ 44 Defendant, while seated in his vehicle, declined Snow's encounter by his words and actions, by saying "no policia" or "f*** you, no policia" and extending his middle finger. Defendant's vehicle was parked between two cars, and Snow was between defendant's driver's side door and the vehicle parked next to it. Similarly to *Gherna*, where there was an officer on each side of the truck, Snow was outside defendant's door, the only reasonable means for defendant to egress. *Gherna*, 203 Ill. 2d at 185, 784 N.E.2d at 811. Snow proceeded to ask defendant to open the door to his vehicle, even after defendant said "no policia" or "f*** you, no policia" and extended his middle finger. Snow's request for defendant to open his door after he declined the encounter demonstrates his compliance was required. See *Gherna*, 203 Ill. 2d at 179, 784 N.E.2d at 807.

¶ 45 Although there was only one officer, no display of a weapon, no physical touching of defendant's person, and no use of language or tone indicating compliance with Snow's request was required, other actions by Snow indicated compliance was required. *Luedemann*, 222 Ill. 2d at 553, 857 N.E.2d at 201. Even though Snow "asked" defendant to open his door, Snow's

location and persistence after defendant declined the encounter were coercive, and we cannot say a reasonable person would feel free to decline Snow's request to open the door or make a *second* attempt to terminate the encounter. See *Luedemann*, 222 Ill. 2d at 557, 857 N.E.2d at 203. Since we determined defendant was seized for fourth amendment purposes, we must address whether Snow had a reasonable, articulable suspicion or probable cause to justify the seizure as reasonable. See *People v. Butler*, 2015 IL App (1st) 131870, ¶ 29, 47 N.E.3d 332 (the fourth amendment only protects against *unreasonable* searches and seizures; a search or seizure is reasonable if it is supported by either probable cause or reasonable suspicion).

¶ 46                    2. *Probable Cause and Reasonable Suspicion*

¶ 47    Next, defendant argues his seizure was unreasonable because it was not supported by probable cause or reasonable suspicion. The State does not address this argument and instead continues to rely on the community caretaking exception, if any seizure occurred at all. The facts known to Snow at the time of the seizure did not amount to probable cause. Snow admitted he did not have knowledge of a traffic violation or criminal offense up to the moment he asked defendant to open his car door. Snow testified his reason for approaching defendant's vehicle was to see why someone would not exit their car five minutes after parking at an apartment complex and if there was a medical emergency. After defendant opened the car door, Snow smelled alcohol and suspected defendant had been driving while intoxicated. The seizure was not supported by probable cause.

¶ 48    Similarly, we find Snow did not have reasonable suspicion to justify the seizure. "[A]n officer may, within the parameters of the fourth amendment, conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity, and such suspicion amounts to more than a mere 'hunch.' " *Gherna*, 203 Ill. 2d at 177, 784 N.E.2d at 806 (citing *Terry*, 392 U.S. at 27). Snow admitted he did not have any knowledge of a traffic violation or criminal offense when he asked defendant to open his car door. Therefore, the seizure was not supported by reasonable suspicion.

¶ 49                    3. *Community Caretaking Exception*

¶ 50    The State argues, if this court determines defendant was seized for fourth amendment purposes, we should find Snow's actions fall within the community caretaking exception. Defendant argues Snow was not performing a community caretaking function when he seized him because it was clear he was not in need of medical assistance.

¶ 51    Community caretaking refers to "a capacity in which the police act when they are performing some task unrelated to the investigation of crime." *Luedemann*, 222 Ill. 2d at 545, 857 N.E.2d at 197. "[P]olice spend relatively less time than is commonly thought investigating violations of the criminal law and spend a good deal of time performing functions as responding to heart attack victims, helping children find their parents, helping inebriates find their way home, responding to calls about missing persons or sick neighbors, mediating noise disputes, responding to calls about stray or injured animals, investigating premises left open at night, taking lost property into their possession, and removing abandoned property." (Internal quotation marks omitted.) *Luedemann*, 222 Ill. 2d at 545-46, 857 N.E.2d at 197.

¶ 52    The community caretaking exception is used to uphold searches or seizures as reasonable under the fourth amendment as long as (1) "law enforcement officers [were] performing some function other than the investigation of a crime" and (2) "the search or seizure [was]

reasonable because it was undertaken to protect the safety of the general public." *People v. McDonough*, 239 Ill. 2d 260, 272, 940 N.E.2d 1100, 1109 (2010). Historically, courts have used the community caretaking exception to describe consensual encounters. See *Luedemann*, 222 Ill. 2d at 544, 857 N.E.2d at 196. In 2006, the Illinois Supreme Court clarified the community caretaking exception is "analytically distinct from consensual encounters and is invoked to validate a search or seizure as reasonable under the fourth amendment." *Luedemann*, 222 Ill. 2d at 548, 857 N.E.2d at 198-99.

¶ 53    The Third District addressed the community caretaking exception with a similar set of facts in *People v. Carlson*, 307 Ill. App. 3d 77, 716 N.E.2d 1249 (1999). The Third District's opinion was pre-*Luedemann* and considered the community caretaking exception analogous to consensual encounters; however, this difference does not affect its conclusion. In *Carlson*, Deputy Nichols observed the defendant's vehicle parked on the side of the road. *Carlson*, 307 Ill. App. 3d at 79, 716 N.E.2d at 1251. Nichols activated his emergency lights and approached the vehicle. *Carlson*, 307 Ill. App. 3d at 79, 716 N.E.2d at 1251. He observed the defendant was unconscious in the driver's seat and could not determine whether he was alive or dead. *Carlson*, 307 Ill. App. 3d at 79, 716 N.E.2d at 1251. The keys were still in the ignition, but the car was not running. *Carlson*, 307 Ill. App. 3d at 79, 716 N.E.2d at 1251. Nichols tapped on the window, and the defendant woke up. *Carlson*, 307 Ill. App. 3d at 79, 716 N.E.2d at 1251. The defendant moved his hand, and it appeared he attempted to smoke a cigarette that was not there. *Carlson*, 307 Ill. App. 3d at 79, 716 N.E.2d at 1251.

¶ 54    Nichols asked the defendant to roll down the window. *Carlson*, 307 Ill. App. 3d at 79, 716 N.E.2d at 1251. The defendant complied, and Nichols immediately detected a strong odor of alcohol. *Carlson*, 307 Ill. App. 3d at 79, 716 N.E.2d at 1251. After the defendant identified himself, Nichols requested him to step outside of the vehicle and produce a driver's license. *Carlson*, 307 Ill. App. 3d at 79, 716 N.E.2d at 1251. Nichols observed the defendant had difficulty locating his license, had bloodshot eyes, was unsteady and confused, and appeared to have wet himself. *Carlson*, 307 Ill. App. 3d at 79, 716 N.E.2d at 1251. Nichols eventually arrested the defendant, and the defendant failed a Breathalyzer test. *Carlson*, 307 Ill. App. 3d at 79, 716 N.E.2d at 1251.

¶ 55    The Third District held, when Nichols initially approached the defendant, including the request for defendant to roll down his window, he was performing under the community caretaking function. *Carlson*, 307 Ill. App. 3d at 81, 716 N.E.2d at 1252. Once the window was down, Nichols detected the odor of alcohol, which provided him with a reasonable, articulable suspicion defendant was driving under the influence. *Carlson*, 307 Ill. App. 3d at 79, 716 N.E.2d at 1251. The court concluded defendant was not seized because there was no evidence of coercive circumstances and Nichols was functioning as a community caretaker. *Carlson*, 307 Ill. App. 3d at 80-81, 716 N.E.2d at 1251.

¶ 56    In the case at bar, Snow was acting in his community caretaking capacity when he approached defendant's vehicle out of concern no one exited the vehicle after five minutes at 1:20 a.m. Even though Snow followed defendant because it appeared defendant was "extremely focused on driving," this is of no consequence. This is not remarkable. After Snow followed defendant, Snow pulled into an adjacent parking lot to turn around and exit the area after he observed no traffic violations had occurred. When Snow noticed no one exited the vehicle, he stopped and waited for five minutes. Snow was concerned as to why no one would exit the vehicle at this time and place and decided to check on the driver. Snow's motive for

- 11 -

approaching defendant's vehicle was divorced from detention, investigation, or acquisition of evidence.

¶ 57    Snow's concern legitimately increased when he found defendant slumped over the driver's seat. Snow continued to act in his community caretaking capacity as he attempted to wake defendant and radioed for an assisting officer to step up his response time. Snow testified he did not know what defendant was experiencing medically. When defendant awakened, he raised his middle finger and said either "f*** you, no policia" or "no policia." This communication, coupled with defendant falling asleep within minutes after parking his car, taking an unusual route, and Snow's observation defendant was "extremely focused on driving," raised concerns about his medical status. Considering the totality of the circumstances, Snow was acting in his capacity as community caretaker when he seized defendant by asking him to open his car door to speak after defendant declined the encounter. Defendant's actions were unusual and gave rise to serious concerns regarding his medical status. When defendant opened his car door, Snow detected the odor of an alcoholic beverage, and defendant exhibited symptoms of being intoxicated, providing Snow with a reasonable, articulable suspicion. At this point, Snow was no longer functioning as a community caretaker, and a DUI investigation began.

¶ 58    Similarly to *Carlson*, after Snow awakened defendant, he asked defendant to open his car door (the defendant in *Carlson* was asked to roll his window down). *Carlson*, 307 Ill. App. 3d at 79, 716 N.E.2d at 1251. The Third District found the officer's request was part of his community caretaking function. *Carlson*, 307 Ill. App. 3d at 81, 716 N.E.2d at 1252. The main difference with the case at bar is defendant declined Snow's encounter. However, Snow's request for defendant to open his door, which resulted in a seizure, was aligned with his interest in defendant's medical status. Based on the aforementioned circumstances, the seizure was reasonable and justified under the community caretaking exception because (1) Snow did not have an investigatory purpose and (2) his actions were taken for defendant's safety.

¶ 59    Nonetheless, defendant cites the Fifth District's opinion, *People v. Robinson*, 368 Ill. App. 3d 963, 859 N.E.2d 232 (2006), to support his contention Snow's actions were not to check on his well-being. In *Robinson*, Officer Stevens responded to a call to check on the well-being of a man in a parked car who appeared to be slumped over the steering wheel. *Robinson*, 368 Ill. App. 3d at 965, 859 N.E.2d at 237. When Stevens approached the car, he noticed the car was running, and the man appeared to be unconscious. *Robinson*, 368 Ill. App. 3d at 966, 859 N.E.2d at 238. Stevens then tapped on the driver's window about six times in an attempt to wake the driver. *Robinson*, 368 Ill. App. 3d at 967, 859 N.E.2d at 238. Stevens discovered the driver's door was unlocked, opened it, and spoke to the driver in an attempt to wake him up. *Robinson*, 368 Ill. App. 3d at 967, 859 N.E.2d at 238. The driver did not wake up, and Stevens grabbed his jacket and moved his body back and forth to try to wake him. *Robinson*, 368 Ill. App. 3d at 967, 859 N.E.2d at 239.

¶ 60    Stevens dispatched for an ambulance and continued to move the defendant back and forth. *Robinson*, 368 Ill. App. 3d at 968, 859 N.E.2d at 239. The defendant became responsive and was mumbling. *Robinson*, 368 Ill. App. 3d at 968, 859 N.E.2d at 239. Stevens observed the defendant had dilated eyes, exhibited slurred and mumbled speech, and had a strong odor of an alcoholic beverage on his breath. *Robinson*, 368 Ill. App. 3d at 968, 859 N.E.2d at 239. Stevens asked the defendant if he was okay, which he answered in the positive. *Robinson*, 368 Ill. App. 3d at 968, 859 N.E.2d at 240. Stevens then asked if he had anything to drink that night, and the

defendant said he had too much to drink. *Robinson*, 368 Ill. App. 3d at 969, 859 N.E.2d at 240. The defendant was charged with aggravated DUI. *Robinson*, 368 Ill. App. 3d at 964, 859 N.E.2d at 236.

¶ 61 The Fifth District held Stevens was acting as a community caretaker by waking the defendant and asking for his identification. *Robinson*, 368 Ill. App. 3d at 973, 859 N.E.2d at 243. Since Stevens was responding to a 911 call, he had a basis to check on the defendant's well-being. *Robinson*, 368 Ill. App. 3d at 973, 859 N.E.2d at 243. While Stevens was performing this community caretaking function, he made observations that arose to a reasonable, articulable suspicion the defendant was driving while under the influence of alcohol. *Robinson*, 368 Ill. App. 3d at 973, 859 N.E.2d at 244. In the present case, defendant argues the officer in *Robinson* had a valid reason to check on the well-being of the defendant, while Snow "offered no actual impetus for why he approached the vehicle." Further, defendant suggests "the vast majority of Snow's conduct was not undertaken with the goal of checking on [his] well-being." However, defendant overemphasizes the importance of the fact the officer in *Robinson* responded to a 911 call. A police officer need not wait for a 911 call to perform as a community caretaker.

¶ 62 Snow followed defendant because he noticed defendant was driving with what he described as "tunnel vision." Once Snow determined no traffic violations occurred, he pulled into in an adjacent lot to exit the area. However, Snow became concerned about defendant's well-being when he did not immediately exit the car. Snow's concern increased, and after five minutes, he decided to approach the vehicle. Snow's concerns were validated as he approached the vehicle and observed defendant passed out and slumped over in the driver's seat. Nothing in the record indicates Snow was investigating a crime or was acting in a role other than as a community caretaker. Waiting for five minutes to exit a vehicle does not necessarily give rise to an issue of a person's well-being, but considering the time of day and the circumstances in their totality, it was objectively reasonable for Snow to approach defendant's vehicle, and then to rule out a medical emergency.

¶ 63 The trial court did not err when it denied defendant's motion to suppress evidence, as Snow was reasonably functioning as a community caretaker when defendant was seized.

¶ 64 B. Aggravating Factors

¶ 65 Defendant argues the trial court imposed an impermissible double enhancement by considering his prior DUI convictions as aggravating factors. Defendant did not file a motion to reconsider the sentence, and he asks this court to review the issue under the second prong of the plain-error doctrine. Alternatively, defendant argues, if this court will not review his challenge to his sentence, defense counsel was ineffective for failing to preserve the issue in a motion to reconsider the sentence. The State contends defendant's argument is forfeited because he failed to properly preserve the issue and, alternatively, the court did not consider any improper factors when it sentenced him and we should decline to address defendant's ineffective assistance argument.

¶ 66 1. *Forfeiture*

¶ 67 Defendant acknowledges he has forfeited this argument by not filing a motion to reconsider the sentence in the trial court or objecting at the sentencing hearing. For an issue to be preserved for review on appeal, the record must show (1) a contemporaneous objection to

the trial court's error was timely made and (2) the issue was contained in a written posttrial motion. *People v. Rathbone*, 345 Ill. App. 3d 305, 308-09, 802 N.E.2d 333, 336 (2003). The forfeiture rule is intended to bar claims from review when they are not first considered by the trial court. *Rathbone*, 345 Ill. App. 3d at 310, 802 N.E.2d at 337. However, defendant requests his sentence be reviewed for plain error.

¶ 68                                2. *The Plain-Error Doctrine*

¶ 69      The forfeiture rule is not absolute, and Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) provides that a court of review may review plain errors that affect substantial rights. The plain-error doctrine is a narrow and limited exception to the forfeiture rule and allows a reviewing court to consider unpreserved error when a clear and obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). Under this analysis, the defendant bears the burden of persuasion. *People v. Herron*, 215 Ill. 2d 167, 187, 830 N.E.2d 467, 480 (2005). We begin our plain-error analysis by first determining whether any error occurred at all. *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1059 (2010).

¶ 70                                3. *Double Enhancement*

¶ 71      "A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case." *People v. Perruquet*, 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884 (1977). These circumstances include the defendant's criminal history, the defendant's potential for reform, and the recognized interest in protecting the public and providing a deterrent. *People v. Hestand*, 362 Ill. App. 3d 272, 281, 838 N.E.2d 318, 326 (2005). However, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor. See *People v. Phelps*, 211 Ill. 2d 1, 11-12, 809 N.E.2d 1214, 1220 (2004) ("a single factor cannot be used both as an element of an offense and as a basis for imposing a harsher sentence than might otherwise have been imposed" (internal quotation marks omitted)). When such a factor is used for a dual purpose, it is referred to as a double enhancement. *Phelps*, 211 Ill. 2d at 12, 809 N.E.2d at 1220.

¶ 72      "The prohibition against double enhancements is based on the assumption that, in designating the appropriate range of punishment for a criminal offense, the legislature necessarily considered the factors inherent in the offense." *Phelps*, 211 Ill. 2d at 12, 809 N.E.2d at 1220. Whether a trial court considered an improper factor when sentencing a defendant is a question of law, which we review *de novo*. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8, 973 N.E.2d 459. There is a strong presumption the trial court based its sentencing judgment on proper legal reasoning. *People v. Dowding*, 388 Ill. App. 3d 936, 942-43, 904 N.E.2d 1022, 1028 (2009).

¶ 73      Defendant argues the trial court improperly relied on his two prior DUI convictions when it sentenced him because they were already inherent in the offense of aggravated DUI. The State argues the court properly considered defendant's prior convictions when it sentenced him to explain why a community-based sentence would be inappropriate.

¶ 74        Defendant relies upon *Dowding* and *Abdelhadi* for his assertion his prior DUI convictions were improperly used as a double enhancement. In *Dowding*, the defendant challenged the sentence on his aggravated DUI conviction and argued the court improperly considered the fact his conduct caused the death of another (a factor inherent in the offense). *Dowding*, 388 Ill. App. 3d at 941, 904 N.E.2d at 1027. At sentencing, the State requested the maximum term of 14 years' imprisonment and stated five times the defendant had " 'killed someone' " or " 'caused the death of someone.' " *Dowding*, 388 Ill. App. 3d at 943, 904 N.E.2d at 1029. The State set forth the following aggravating factors: "(1) the defendant's conduct caused or threatened serious harm; (2) the defendant has a history of prior delinquency or criminal activity; and (3) the sentence is necessary to deter others from committing the same crime." *Dowding*, 388 Ill. App. 3d at 943, 904 N.E.2d at 1029. The trial court considered a number of factors at sentencing and stated, " 'The factors in aggravation that I do find apply in this case are, Number 1, that the defendant's conduct caused or threatened serious harm. No question, this defendant's conduct in this offense caused the greatest harm there could be, that is the death of another person.' " *Dowding*, 388 Ill. App. 3d at 943, 904 N.E.2d at 1029. On review, the Second District held the trial court improperly considered the victim's death as an aggravating factor when it expressly stated causing the victim's death was an aggravating factor on which the sentence was based. *Dowding*, 388 Ill. App. 3d at 943-44, 904 N.E.2d at 1029 (finding the trial court's sentence mirrored the State's argument). The defendant's sentence was reversed, and the court remanded for a new sentencing hearing. *Dowding*, 388 Ill. App. 3d at 946, 904 N.E.2d at 1031.

¶ 75        In *Abdelhadi*, the defendant challenged the sentence on his aggravated arson conviction and argued the trial court improperly considered the threat of harm to others because it was a factor inherent in the offense. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 6, 973 N.E.2d 459. The State argued the following factors in aggravation: "(1) the defendant's acts endangered or could have endangered the lives of one or more people inside the building; (2) the defendant had a criminal history; and (3) the defendant was on probation when the crime was committed." *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 3, 973 N.E.2d 459. When issuing its sentence, the trial court stated, " 'Specifically in aggravation the Court has considered that the conduct caused by the defendant did, in fact, endanger the lives of individuals. That he was on probation at the time of the event. Court has considered his criminal history in aggravation.' " *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 4, 973 N.E.2d 459.

¶ 76        The Second District found its decision in *Dowding* controlling. The court held, "we find that the trial court's reference to the defendant's threat of harm to others, with no elaboration or description of that factor, did not amount to merely a mentioning within the 'nature and circumstances' of the crime. Instead, the mirroring between the factors the State argued in aggravation and the factors used by the trial court in sentencing shows that there was, in fact, reliance by the trial court on the implicit factor." *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 14, 973 N.E.2d 459. The court found reversing the defendant's sentence and remanding for a new sentencing hearing was proper because it was unclear how much weight the trial court placed on the improper factor. *Abdelhadi*, 2012 IL App (2d) 111053, ¶¶ 20-21, 973 N.E.2d 459.

¶ 77        Defendant argues his case is indistinguishable from *Dowding* and *Abdelhadi* because the State argued his prior DUI convictions in aggravation, similar to the harm caused or threat of harm caused elements considered in *Dowding* and *Abdelhadi*, respectively. Defendant points out, "the State went on to explain that [defendant] had a 2010 and 2005 DUI conviction, as

- 15 -

well as a prior theft conviction, before asking the court to sentence [him] to seven years, the maximum possible sentence, because of [his] 'criminal history and [his] repeated violation of the DUI statute.' " Defendant suggests the trial court adopted the State's argument when it said, "the State has articulated that one of the factors in aggravation present is the [d]efendant's record of criminality." The court's only direct statement referencing defendant's two prior DUI convictions was, "[d]efendant has continued to drink and drive without a license."

¶ 78    Although not cited by either party, we find *People v. Morrow*, 2014 IL App (2d) 130718, 39 N.E.3d 44, instructive on this issue, as it addressed both *Dowding* and *Abdelhadi* in a factually similar case. In *Morrow*, the defendant was convicted of aggravated DUI (with at least five prior DUI convictions), a Class X felony. *Morrow*, 2014 IL App (2d) 130718, ¶ 1, 39 N.E.3d 44. The defendant argued the trial court erred when it used his prior DUI convictions in aggravation when the convictions were used to elevate the offense to a Class X felony. *Morrow*, 2014 IL App (2d) 130718, ¶ 1, 39 N.E.3d 44. At sentencing, the State presented evidence the defendant had 7 DUI convictions between 1987 and 1995, had 10 total DUI arrests (two were reduced to reckless driving), was sentenced to prison twice for aggravated DUI, and had an alcohol-related conviction of violation of an order of protection in 2003 and an arrest for criminal damage to state property in 2009. *Morrow*, 2014 IL App (2d) 130718, ¶ 4, 39 N.E.3d 44. The State referred to the defendant's prior DUI incidents and argued he was a danger to the public. The State requested he be sentenced to 15 years' imprisonment. *Morrow*, 2014 IL App (2d) 130718, ¶ 5, 39 N.E.3d 44.

¶ 79    Before issuing its sentence, the trial court stated, "there are a number of people in this society that are abused as children and they don't go out to repeatedly violate the driving under the influence of alcohol laws of this state or any state on a repeated basis." (Internal quotation marks omitted.) *Morrow*, 2014 IL App (2d) 130718, ¶ 7, 39 N.E.3d 44. The Second District quoted the trial court and stated, in relevant part, as follows:

> "[T]he vast majority of offenders 'are so impacted by that one arrest, either the public shame or self-reflection how they got there, they never, ever put themselves in that position again. *But yet you find yourself here for the eighth violation, the eighth time.*' Reciting defendant's previous DUI convictions, along with his other convictions, the court stated that all the trips to prison did not slow defendant down. Indicating a concern for public safety and citing the need for deterrence, the court sentenced defendant to 13 years' incarceration." (Emphasis added.) *Morrow*, 2014 IL App (2d) 130718, ¶ 8, 39 N.E.3d 44.

¶ 80    The Second District held *Morrow* was distinguishable from *Dowding* and *Abdelhadi*. It found the trial court's statements went only to the nature and circumstances of the offense and to other proper factors. *Morrow*, 2014 IL App (2d) 130718, ¶ 19, 39 N.E.3d 44. Unlike *Dowding* and *Abdelhadi*, the court did not solely rely on the fact defendant had at least five prior DUI convictions. *Morrow*, 2014 IL App (2d) 130718, ¶ 8, 39 N.E.3d 44. The trial court never specifically stated it was considering the prior convictions in aggravation, and the State did not ask it to. *Morrow*, 2014 IL App (2d) 130718, ¶ 8, 39 N.E.3d 44. The State's arguments showed that it was discussing the prior convictions to address recidivism, inability to learn from prior punishments, deterrence, and the protection of society. *Morrow*, 2014 IL App (2d) 130718, ¶ 8, 39 N.E.3d 44.

¶ 81    We find our case more comparable to *Morrow* and conclude the trial court did not improperly consider defendant's prior DUI convictions at sentencing. The State in this case did

not focus solely on defendant's DUI convictions when it discussed his criminal history. When the court stated, "The State articulated that one of the factors in aggravation present is the [d]efendant's record of criminality," it was not improper. The court went on to discuss defendant's prior theft conviction and the multiple petitions to revoke that were filed, evidencing his inability to comply with a community-based sentence. Additionally, similarly to *Morrow*, the discussion regarding defendant's prior DUI convictions went only to the nature and circumstances of the offense and other proper factors. *Morrow*, 2014 IL App (2d) 130718, ¶ 19, 39 N.E.3d 44; see *People v. Thomas*, 171 Ill. 2d 207, 227-28, 664 N.E.2d 76, 87 (1996) (finding "while the *fact* of a defendant's prior convictions determines his eligibility for a Class X sentence, it is the *nature and circumstances* of these prior convictions which, along with other factors in aggravation and mitigation, determine the exact length of that sentence" (emphases in original)).

¶ 82    The State presented defendant's criminal history to show defendant's lack of rehabilitative potential, the need for deterrence, and the concern it had over the public's safety. After reviewing the record as a whole, no evidence indicated the court improperly considered defendant's prior DUI convictions. Because no error occurred, defendant cannot establish plain error. Since we disposed of defendant's double-enhancement argument under plain error, we need not address whether counsel was ineffective for failing to properly preserve the issue for appellate review.

¶ 83                                   III. CONCLUSION

¶ 84    We affirm the trial court's judgment. As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal.

¶ 85    Affirmed.